## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

BRANDI RATLIFF,  WILLIAM                    §
RYAN GRENWELGE, PHILLIP                     §
JENSEN, JOSEPH SCHTULMANN,                  §
TOMOKO ITO KING, WASSIM                     §
GEORGE MATTA, JOHN NGUYEN,                  §
MATTHEW MUI, RALPH ANTHONY                  §
FIGUEROA, META SUTTON,                      §
JESSE V. ALANIZ, FRANK BUTLER,              §
GERALDO RODRIGUEZ, RAY MCGEE,               §
CHRISTOPHER BICKI, and AHMAD                §
AL-RIFAIE                                   §
        Plaintiffs,                §
                                         §
v.                                          §          CIVIL ACTION NO. H-02-3809
                                         §
THE CITY OF HOUSTON, *et al.*,              §
        Defendants                 §
                                         §

## MEMORANDUM AND ORDER

## TABLE OF CONTENTS

I.     Background ............................................................................................   2

II.    Summary Judgment Standards.............................................................   4

III.   Section 1983 Claims Against City of Houston....................................   6

       A.     Plaintiffs' New Theory Not Pleaded in Their Complaint........................   8
       B.     Background on Smith Plan and Jackson Plan...........................   12
       C.     Detention Without Reasonable Suspicion...............................   19
       D.     Analysis of Formal City Policies............................................   24
              1.     Analysis of Facial Constitutionality of City Policies...................   27
                     a.     "Zero Tolerance" Policy...................................   28
                     b.     Smith Plan.....................................................   29
                     c.     Jackson Plan..................................................   30
              2.     Analysis of Constitutionality of Facially Innocuous City
                     Policies..........................................................................   40
                     a.     "Zero Tolerance" Policy...................................   41
                     b.     Smith Plan.....................................................   41
       E.     Analysis of Informal Policy:  Evidence of a Recurring Pattern to
              Show a Custom or Practice..........................................................   42
              1.     Arrest Without Probable Cause......................................   43
              2.     Detention Without Reasonable Suspicion.......................   46
       F.     Municipal Liability Based on Single Incident of Arrests Without
              Probable Cause.............................................................................   55
       G.     Failure to Supervise and Failure to Protect Claims ..............   58
       H.     Conclusion on Claims Against City........................................   58

IV.    Claims Against Chief Bradford Individually.......................................   58

       A.     Section 1983 Claims Based on Policy or Practice..................   60
       B.     State Law Claims ..........................................................................   65

V.     Conclusion and Order...........................................................................   67

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| BRANDI RATLIFF, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-02-3809 |
| | § | |
| THE CITY OF HOUSTON, *et al.*, | § | |
| Defendants | § | |
| | § | |

## MEMORANDUM AND ORDER

Pending before the Court in this civil rights dispute arising from the August 2002 arrest of Plaintiffs is a Motion for Summary Judgment [Doc. # 77] ("Defendants' Motion") filed by The City of Houston (the "City") and former Chief of Police C.O. Bradford ("Bradford").[1]  Plaintiffs have filed a Response [Doc. # 84] ("Plaintiffs' Response"), to which Defendants have filed a Reply [Doc. # 87].[2]  Plaintiffs have filed a Response to Defendants' Reply.[3]  The motion is ripe for decision.  Having considered the parties' submissions, all matters of record, and the applicable legal authorities, the Court concludes that Defendants' Motion should be **granted in part and denied in part**.

---

[1]     In addition to the City and Bradford, HPD Captain Mark Aguirre remains a Defendant in this case.  All other Defendants have been dismissed.

[2]     In their Reply, Defendants refer the Court to the substance of their Reply in a companion case in this Court, *Lopez, et al. v. The City of Houston, et al.,* Cause No. H-03-2297 [*Lopez* Doc. # 151].

[3]     Plaintiffs' second response was not docketed with this case, but was docketed with the *Lopez* case [*Lopez* Doc. # 160].

I.    **BACKGROUND**

The following facts are alleged in Plaintiffs' Fourth Amended Complaint [Doc. # 74].

On August 17, 2002 at about 12:30 a.m., Plaintiffs Brandi Ratliff and William Ryan

Grenwelge were leaving the parking lot of a K-Mart shopping center in the 8400 block of

Westheimer in Houston after a quick shopping trip.  A Houston Police Department ("HPD")

patrol car abruptly blocked their exit and police officers approached their car with drawn

guns, shouting for them to exit the vehicle.  Grenwelge alleges that one officer approached

his window and pointed a gun at his head.  Despite telling the officers that they were K-Mart

customers, Ratliff and Grenwelge were handcuffed with plastic ties with hands behind their

backs.  They were placed under arrest, separated, taken to different jails, and charged with

trespassing.  Grenwelge alleges that his groin was injured during a frisk, and that at the

prison, an officer forced him to sit down in urine.  Both Ratliff and Grenwelge spent the

night in jail before being released on bond the next day.  Grenwelge was not released until

nearly 24 hours after posting bond, allegedly because the police lost record of his having

been arrested and he was lost within the jail system.[4]

Plaintiffs Phillip Jensen, Joseph Schtulmann, Tomoko Ito King, Wassim George

Matta, John Nguyen, Matthew Mui, Ralph Anthony Figeroa, Meta Sutton, Jesse V. Alaniz,

Frank Butler, Geraldo Rodriguez, Ray McGee, Christopher Bicki, and Ahmad Al-Rifaie

---

[4]    Affidavit of William Ryan Grenwelge, Exhibit 95 to Plaintiffs' Response; Plaintiffs' Fourth
Amended Complaint, at 2-3.

were arrested the night before, on August 16, 2002, while gathered at a James Coney Island restaurant on Westheimer.  Plaintiffs allege that officers handcuffed and took them to jail despite being informed by James Coney Island personnel that Plaintiffs were regular customers of the restaurant and were not involved in any illegal activity.  Plaintiffs in this case and companion cases complain that the plastic ties used to restrain them for hours were unreasonably tight, causing loss of circulation, significant pain, and lingering physical injury.  They also complain of the conditions at the jail such as overcrowding, urine covering the floor and seats, undrinkable water, and inedible food.  Many of these plaintiffs allege they were left handcuffed, defenseless, in a holding cell mixed with violent offenders who were uncuffed and aggressive, and who engaged in a fight in at least one instance during the night.  Many allege they remained cuffed in the holding tank, unable to use the restroom, for several hours.  Matta alleges that his handcuffing caused stitches, left in his arm after a recent surgery, to rip, requiring a second surgery.  Al-Rifaie contends that the officers pushed him around and derided his name and racial heritage.  Many of the Plaintiffs were not released until the following afternoon.  Some were forced to miss a day of work.  Some allege they were coerced to plead guilty with threats they would remain in jail longer if they asserted their innocence.  Ultimately, all charges against these Plaintiffs were summarily dismissed as wrongful arrests.[5]

---

[5]     *See* Affidavits of Jesse Ananiz, Phillip Jensen, Tomoko Ito King, Wassim George Matta, Frank Butler, Ralph Figeroa, Joseph Shtulmann, Ahmad Al-Rifaie, Exhibit 95 to Plaintiffs' Response; Plaintiffs' Fourth Amended Complaint, at 2-4.

Plaintiffs' arrests were allegedly made pursuant to an HPD initiative dubbed "Operation ERACER," a mass arrest of two hundred seventy-eight people on August 16, 17, and 18, 2002, intended to target illegal street racing. All Plaintiffs allege that the operations were conducted by Captain Mark Aguirre with the knowledge and express or implied authorization of Chief C.O. Bradford. Plaintiffs further allege that the arrests were made pursuant to an express or implied policy of HPD known as "zero tolerance." Plaintiffs allege that pursuant to the "zero tolerance" policy, HPD targets an area and arrests anyone and everyone in the area without regard for probable cause or evidence of criminal activity.

There is no evidence before the Court that any street racing occurred on the evenings in question.

Plaintiffs assert causes of action pursuant to 42 U.S.C. § 1983 against the City, Bradford, and Aguirre for civil rights violations. Plaintiffs also assert state law causes of action against Bradford and Aguirre for the intentional torts of wrongful assault and false arrest and imprisonment.

## II.   SUMMARY JUDGMENT STANDARDS

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002). An issue is material if its resolution could affect the outcome of the action. *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In deciding whether a fact issue has been created, the facts and the inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Hotard v. State Farm Fire & Cas. Co.*, 286 F.3d 814, 817 (5th Cir. 2002). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy – that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998). The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Id.* If the movant meets this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275,

282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1998)). A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* (quoting *Smith v. Brenoettsky*, 158 F.3d 908, 911 (5th Cir. 1998)); *see also Quorum Health Resources, L.L.C. v. Maverick County Hosp. District*, 308 F.3d 451, 458 (5th Cir. 2002).

The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See Morris v. Covan Worldwide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998); *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002) (noting that "unsworn pleadings do not constitute proper summary judgment evidence," quoting *Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994)). Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden. *Id.* Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *revised on other grounds upon denial of reh'g*, 70 F.3d 26 (5th Cir. 1995); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

## III.   SECTION 1983 CLAIMS AGAINST CITY OF HOUSTON

Plaintiffs claim in their Fourth Amended Complaint ("Complaint") that they were wrongfully arrested pursuant to HPD's "zero tolerance" policy and practice, and on formal

HPD plans utilizing "zero tolerance" to target street racing.  In their Complaint, Plaintiffs assert claims against the City pursuant to 42 U.S.C. § 1983 based solely upon these alleged Fourth Amendment violations.  In their Response to Defendants' Motion, although not alleged in their Complaint, Plaintiffs claim the City allegedly inadequately supervised its inferior officers.

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  42 U.S.C. § 1983.  Thus to establish liability under § 1983 there must be (1) a deprivation of a right secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor.  *Victoria W. v. Larpenter,* 369 F.3d 475, 482 (5th Cir. 2004).

There are essentially five avenues for establishing local government liability under § 1983.  A plaintiff may assert liability based on: (1) an illegal official governmental policy or decision; (2) an illegal custom or practice within the government; (3) a custom or policy of inadequate training, supervision, discipline, screening, or hiring; (4) illegal conduct of an official with final policymaking authority; or (5) a municipality's ratification of illegal acts.  *See Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658, 694 (1978) (municipality may be held liable under § 1983 when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."); *City of Canton v. Harris*, 489 U.S. 378, 385-

87 (1989) (inadequacy of training may serve as basis for liability where failure to train amounts to deliberate indifference to rights of persons); *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 736-37 (1989) (municipality liable for isolated actions or decisions of its employee only where the employee has "final policymaking authority" such that decision represents official policy); *Grandstaff v. City of Borger,* 767 F.2d 161, 171 (5th Cir. 1985) (finding municipal liability based on city's failure to reprimand or discharge officers after their egregious conduct). *See generally* Karen M. Blum, *Local Government Liability Under Section 1983,* 715 PLI/LIT 7 (2004). Plaintiffs' Response incorporates arguments based in the first four grounds for liability.

Before the Court turns to the City's summary judgment arguments, it first must address whether Plaintiffs can assert a new claim against the City not alleged in their Complaint.

### A.    Plaintiffs' New Theory Not Pleaded in Their Complaint

Plaintiffs have filed a Response to Defendants' Motion jointly with the plaintiffs in three companion cases. The Response addresses failure to supervise and failure to protect claims that were never pleaded by Plaintiffs in their Complaint in this case, and relies on numerous facts not pleaded by Plaintiffs' Complaint.[6] Plaintiffs have not requested leave to

---

[6]    Plaintiffs also claim for the first time in their Response that they were detained without reasonable suspicion. The Court does not construe this as a "new claim" because "detention" can fairly be said to be encompassed by Plaintiffs' allegations concerning their "zero tolerance" policy and the facts regarding their arrests. "The notice pleading requirements of Federal Rule of Civil Procedure 8 and case law do not require an inordinate amount of detail
(continued...)

amend to add insufficient supervision claims.  Because Plaintiffs do not allege facts in their Complaint or the theory that City policymakers inadequately supervised inferior officers, these arguments against the City in Plaintiffs' Response may be construed as an implicit motion for leave to amend the Complaint to add a new claim after the amendment deadline. *See Ganther v. Ingle,* 75 F.3d 207, 211-12 (5th Cir. 1996).  The request also comes after the close of discovery and after Defendants filed their summary judgment motion pursuant to deadlines set by the Court in Docket Control Orders, as amended from time to time in this case.  Under Federal Rule of Civil Procedure 15(a), leave to amend "shall be freely given when justice so requires."  The Fifth Circuit has concluded that Rule 15(a) "evinces a bias in favor of granting leave to amend."  *See Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003) (citations omitted).  However, leave to amend is by no means automatic.  The decision to grant or deny leave to amend "is entrusted to the sound discretion of the district court."  *Lyn-Lea Travel Corp. v. American Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002) (citations and internal quotations omitted); *accord Goldstein*, 340 F.3d at 254; *Parish v. Frazier*, 195 F.3d 761, 763 (5th Cir. 1999).  In deciding whether to grant leave to file an

---

[6]       (...continued)
or precision."  *St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425,  434 (5th Cir. 2000). Rule 8(a) of the Federal Rules of Civil Procedure provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a).  "Pursuant to Rule 8(a), a complaint will be deemed inadequate only if it fails to (1) provide notice of circumstances which give rise to the claim, or (2) set forth sufficient information to outline the elements of the claim or permit inferences to be drawn that these elements exist."  *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 164 (5th Cir. 1999). Consequently, the Court will evaluate the merits of Plaintiffs' claims that the City engaged in a formal or informal policy of wrongful detention.

amended pleading, the district court "may consider such factors as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (leave to amend denied because of bad faith and dilatory motive); *see also United States v. Humana Health Plan of Texas Inc*, 336 F.3d 375, 386-87 (5th Cir. 2003) (denying leave where plaintiff failed to correct deficiencies through two prior amendments); *Goldstein*, 340 F.3d at 254.

Set against the backdrop of Rule 15(a) is Rule 16(b), which governs trial scheduling and planning. The Fifth Circuit has held that the decision whether to grant a party leave to amend pleadings after the time designated in the scheduling order is guided by Rule 16(b). "Rule 16(b) provides that a scheduling order 'shall not be modified except upon a showing of good cause and by leave of the district judge.' The good cause standard requires the 'party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.'" *Southwestern Bell Telephone Co. v. City of El Paso,* 346 F.3d 541, 546 (5th Cir. 2003) (citing *S & W Enters., L.L.C. v. Southtrust Bank of Ala., N.A.,* 315 F.3d 533, 535 (5th Cir. 2003) (quoting 6A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1522.1 (2d ed. 1990))). The Fifth Circuit added: "In determining good cause, we consider four factors: '(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such

prejudice.'" *Id.* at 546 (citing *S & W Enters.,* 315 F.3d at 535).   Thus, a party's attempt to raise new theories of recovery by amendment must be carefully scrutinized when the opposing party has filed a motion for summary judgment.   *See Parish v. Frazier,* 195 F.3d 761, 764 (5th Cir. 1999).   As the Fifth Circuit has noted, "[m]uch of the value of summary judgment procedure . . . would be dissipated if a party were free to rely on one theory in an attempt to defeat a motion for summary judgment and then, should that theory prove unsound, come back long thereafter and fight on the basis of some other theory."   *Little v. Liquid Air Corp.,* 952 F.2d 841, 846 (5th Cir. 1992) (quoting *Freeman v. Continental Gin Co.,* 381 F.2d 459, 469-70 (5th Cir. 1967)).   In short, except under extraordinary circumstances, a party may not assert new claims in response to a motion for summary judgment.   *See Wood Arts Golf, Inc. v. Callaway Golf Co.,* 196 F. Supp. 2d 467, 469 n.1 (S.D. Tex. 2002) (Hittner, J.).

In the instant case, analysis of the Rule 16 "good faith" factors dictates denial of amendment to Plaintiffs' Complaint at this very late stage in this suit.   Plaintiffs have not explicitly made a request for leave to amend their Complaint.   They have entirely failed to explain their failure to timely move for leave to amend.   Although the failure to supervise claim may be of assistance to Plaintiffs in obtaining recovery from Defendants, it is not the only claim that will survive summary judgment in this lawsuit against the City and Bradford.   Defendants would be prejudiced were the Court to allow an amendment at this late date because these Plaintiffs have never before in the course of this lawsuit asserted,  or even

hinted at, a failure to supervise claim.[7]  Plaintiffs do not allege any facts in their Complaint

concerning supervision; indeed, Plaintiffs do not mention of the word or concept of

supervision.   A failure to supervise claim is a Fourteenth Amendment substantive due

process claim, *see Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 284 n.7 (5th Cir.

2002), and Plaintiffs' Complaint does not plead the Fourteenth Amendment.   In short,

Plaintiffs have not demonstrated that they put the City on notice that they intended to assert

a failure to supervise claim.   The Court can conceive of no reason Plaintiffs did not seek

amendment and thus provide this notice to the City well prior to the City's filing of its

summary judgment motion.   *See Parish v. Frazier,* 195 F.3d 761, 763 (5th Cir. 1999).

Finally, a continuance is not available to cure prejudice to the City.   The schedule of this

case is tied to numerous companion cases.   The Court therefore will not entertain Plaintiffs'

arguments in this case asserting that the City should be liable on the basis of inadequate

supervision.

### B.      Background on "Smith Plan" and "Jackson Plan"

The City argues in its motion for summary judgment that Plaintiffs have no evidence

of an illegal formal or informal city policy.   Central to Plaintiffs' claims regarding City

---

[7]      There are companion cases asserting such claims but no consolidation with this suit was
ordered.

policy are the "Smith Plan"[8] and the subsequent "Jackson Plan,"[9] operational policies for anti-street racing initiatives that both called for implementation of "zero tolerance." Before the Court discusses the merits of the City's arguments, an explanation of the factual background about the two plans is necessary. As this is a motion for summary judgment, the Court considers the evidence in the light most favorable to Plaintiffs, the nonmovants.

It became apparent to HPD and the City around May 2000 that a large number of import vehicles were being stolen to replace auto parts damaged during the course of illegal street racing.[10] In addition, the City attributed to street racing several automobile accidents involving fatalities. HPD concluded that racing had grown to an "epidemic" level, and was creating public nuisances such as noise and air pollution, large crowds trespassing on private property, and damage to public and private property.[11] The City received a "number" of citizen complaints regarding at least one clandestine drag racing location, and managers of at least one business found it necessary to hire off-duty police officers to patrol their parking lot to keep it free of racers and racing enthusiasts.[12]

---

[8]     See Memorandum dated May 30, 2002 from S.A. Smith to J.L. Breshears, Exhibit 22 to Plaintiffs' Response (the "Smith Plan").

[9]     Memorandum dated Aug. 1, 2002 from F.S. Jackson to Officers and Supervisors, South Patrol Command, Exhibit 24 to Plaintiffs' Response (the "Jackson Plan").

[10]    Smith Plan, at 1.

[11]    See id.; Memorandum dated July 2, 2002 from S.A. Smith to J.L. Breshears, Exhibit 23 to Plaintiffs' Response, at 1 (the "Smith Evaluation"); Memorandum dated May 13, 2002 from M.A. Aguirre to C.O. Bradford, Exhibit 25 to Plaintiffs' Response, at 1.

[12]    See Smith Evaluation, at 1.

At a departmental meeting on April 18, 2002, Chief Bradford questioned his officers regarding what was being done about the growing problem of illegal street racing.[13]

Aguirre suggested that HPD deal with the street racing problems by "implementing Zero Tolerance tactics, mass arrests, and towing vehicles to send a message to those individuals involved in such activities and hit them in their pocketbooks."[14] Bradford praised the recommendation publicly at the meeting.  There is an indication that, during this April 18 discussion, Bradford apparently stated that HPD's legal department did not need to review every proposed plan of action, thereby suggesting the anti-street racing initiatives did not need legal department approval.[15]

 On May 13, 2002, Aguirre submitted to Bradford through the chain of command a proposal to Eliminate Street Racing, which he dubbed "Operation ERACER" (Eliminate and Remove Autos Causing Environmental Ravagement).[16] Aguirre's plan called for use of "zero tolerance" in an operation to take place at an undetermined date.  Executive Assistant Chief J.L. Breshears testified that he rejected this plan, in part because it did not include a surveillance component.[17]

---

[13]     Investigation Summary, Exhibit 5 to Plaintiffs' Response, at 208.

[14]     *Id*.

[15]     *Id.*

[16]     Memorandum dated May 13, 2002 from M.A. Aguirre to C.O. Bradford, Exhibit 25 to Plaintiffs' Response.

[17]     Deposition of J.L. Breshears, Exhibit 38 to Plaintiffs' Response, at 75-76; Deposition of J.L. (continued...)

On May 30, 2002 Captain S.A. Smith submitted to Breshears a plan of action for a "Street Racing Initiative," with planned overt operations led by Captain Smith tentatively set for the weekends of June 21 and June 28, 2002.  For clarity and ease of reference, the Court will refer to the May 30 document as the "Smith Plan," and to the planned operation as the "Smith Initiative."  The Smith Plan called for a covert phase consisting of three weekends of undercover surveillance to collect evidence and establish probable cause prior to the second phase, the overt operation.  The Smith Plan's overt operation called for "[a]rrest teams [to] conduct zero tolerance sweeps through any identified street racing sites and/or staging areas."  Bradford himself approved the Smith Plan as submitted to him in writing.[18]  Bradford designated the Smith Plan as the "model" plan and gave Breshears authority to approve any plan that complied with it.[19]

Overt operations were carried out for the Smith Initiative on June 15 and June 22, 2002.  Thereafter, Smith drafted an evaluation dated July 2, 2002 for Executive Assistant Chief Operations Coordinator Breshears (the "Smith Evaluation").  Smith reported that his June 15 operation had involved a mass detention of all persons congregating in certain retail parking lots:

> [U]ndercover officers placed the vehicles in strategic positions from which, upon command, they could effectively block all exits from the raceway.

---

[17]      (...continued)
Breshears, Exhibit 36 to Plaintiffs' Response, at 82-83.June 7, 2005

[18]      Deposition of C.O. Bradford, Exhibit 49 to Plaintiffs' Response, at 97-98.

[19]      Smith Evaluation, at 3.

Within one minute, officers in marked units converged on each exit location clearly displaying an overwhelming police presence. A single exit, manned by both uniformed and plainclothes officers was created. Uniform and non-uniform personnel contained in excess of three hundred and fifty vehicles with an area that provided no less than eight separate avenues of escape. Estimates provided by helicopter patrol surveillance indicate that no more than eight vehicles escaped the perimeter established by police. The occupants of each vehicle were interviewed within a period of less than two hours, and the scene was cleared.[20]

Smith also reported in the Evaluation that on Saturday, June 22, 2002, undercover officers observed violations related to racing and reckless driving, resulting in numerous citations and arrests. The Smith Evaluation does not state whether HPD conducted a mass detention on June 22, 2002.[21] Breshears testified that he discussed the Smith Evaluation and the results of the Smith Initiative with his subordinate commanders, including Assistant Chief C.A. McClelland, characterizing the Smith Initiative as "successful."[22]

McClelland testified that he told Bradford and Breshears he intended to run a street racing initiative.[23] McClelland gave approval to Aguirre to devise a new street racing plan, a task which Aguirre then delegated to Lieutenant Frank S. Jackson.[24] Jackson issued a memorandum dated August 1, 2002 (the "Jackson Plan") containing plans to implement

---

[20]   *Id.* at 3.

[21]   *Id.*

[22]   Deposition of J.L. Breshears, Exhibits 51, 66 to Plaintiffs' Response, at 93, 157.

[23]   Deposition of C.A. McClelland, Exhibit 70 to Plaintiffs' Response, at 125, 127.

[24]   Deposition of C.A. McClelland, Exhibit 41 to Plaintiffs' Response, at 120; Deposition of M.A. Aguirre, Exhibit 42 to Plaintiffs' Response, at 70.

Operation ERACER, set for the weekend of August 16, 2002.  The "Jackson Plan" stated that

McClelland had approved and authorized a plan of action for Operation ERACER.[25]  The

Jackson Plan purported to rely on prior surveillance and included the use of undercover

officers to identify those participating in illegal activity.   It also employed the "zero

tolerance" mass detention strategy that had been put into practice in the Smith Initiative:

> Zero Tolerance will be the strategy utilized to combat this problem.  All exits
> to the area will be blocked and closed by units designated for containment.
> All vehicles within the containment area will be inspected and scrutinized for
> violations.  Each vehicle will be directed toward a specified exit.  As the
> vehicles leave the containment area, they will be divided into groups.  Those
> identified as 'racers' will be arrested for the violations committed and the
> vehicles will be inventoried and towed to a certified storage lot.  Those
> vehicles containing juveniles or persons found to be consuming alcoholic
> beverages will be addressed in the same manner.  Those believed to be
> spectators should be directed toward the exit of a parking lot.  Once they are
> on the street, the drivers may be checked for driver's license and insurance.
> The vehicles may be checked for registration and inspection sticker.  Citations
> will be issued for all violations discovered during the course of the operation.[26]

Plaintiffs' evidence suggests that at some point in Operation ERACER's planning stage,

communication among certain of the superior HPD officers broke down.  An HPD internal

investigation concluded that Aguirre "never planned to adhere to an unrealistic standard

[outlined in the Jackson Plan] of having his officers establish independent probable cause for

each person arrested at 8400 Westheimer.  [Aguirre] planned for the Surveillance . . . Teams

to identify legitimate customers.  Everyone else found within the containment area went to

---

[25]     McClelland later stated in a memorandum that he approved the Jackson Plan.  *See*
Memorandum from C.A. McCleland to All Captains, South Patrol Command dated Aug. 12,
2002, Operation ERACER, Exhibit 45 to Plaintiffs' Response.

[26]     Jackson Plan, at 3.

jail."[27]  In other words, Aguirre shifted the Plan in a fundamental way – from the assumption that all would be detained, but only those observed violating the law would be arrested – to the assumption that not only would everyone be detained, but all except those persons specifically observed behaving legally would be arrested.

Aguirre also added the crime of trespassing to the list of violations for which police would be scrutinizing the crowds.  More specifically, during the Smith Initiative, persons were arrested or cited for reckless driving, traffic violations, curfew violations, outstanding warrants, public intoxication, and DWI, crimes that officers actually observed.[28]  The Jackson Plan called for arrests of persons seen committing violations of law, such as those identified as street racers, juveniles,[29] and persons consuming alcoholic beverages.[30]  Under Aguirre's direction, Jackson subsequently added a trespass component to the plan for Operation ERACER in a document dated August 16, 2002, known as the "Game Plan."[31] Jackson stated in the Game Plan:  "Make no mistake in the intent of the project; this is a Zero Tolerance operation.  Trespass Affidavits have been obtained for each location described and the no trespass signs have been posted.  The majority of the arrests will be for the city

---

[27]  Investigation Summary, Exhibit 75 to Plaintiffs' Response, at 375.

[28]  Smith Evaluation, at 3.

[29]  Presumably, this refers to minors violating Houston's curfew laws.

[30]  Jackson Plan, at 3.

[31]  *See* Deposition of F.S. Jackson, Exhibit 19 to Defendants' Reply, at 229-31.

ordinance of trespass remaining . . . ."[32]  This decision proved problematic for the City and Aguirre, as (1) some of the sites actually targeted were open businesses with legitimate customers; and (2) one element of the crime of trespassing is failure to leave the property when asked,[33] while the Jackson Plan called for containment of all persons without any instruction to visitors to exit the premises or opportunity to do so before detention and possible arrest.

Plaintiffs have not identified any evidence suggesting that a City policymaker saw the Game Plan prior to the events at issue in this case, nor that the Game Plan was *per se* approved by a policymaker.

### C.   Detention Without Reasonable Suspicion

Plaintiffs argue that the Smith Plan, the Jackson Plan, and/or the City's underlying "zero tolerance policy," violate the Fourth Amendment because they call for the detention and questioning of all persons within a specified containment area, regardless of whether those persons had a legal right to be present on the premises contained.  Plaintiffs claim that the Smith and Jackson Plans and/or the City's "zero tolerance" procedure illegally dispensed with the Fourth Amendment requirement that persons may be "seized" – in this context, temporarily detained for questioning – by police only upon reasonable suspicion.  Plaintiffs

---

[32]  Game Plan, Memorandum dated August 16, 2002, Exhibit 14 to Defendants' Reply, at 2.

[33]  *See, e.g.,* TEX. PENAL CODE ANN. § 30.05(a) ("A person commits an offense if he enters or remains on or in property . . . of another without effective consent . . . and he:  (1) had notice that the entry was forbidden; or (2) received notice to depart but failed to do so.").

claim that the Plans and "zero tolerance" called for the illegal mass detention of all persons at the listed sites. In response, Defendants argue that the detentions planned for the various street racing initiatives were permissible on the basis of *Terry v. Ohio*, 392 U.S. 1, 30 (1968). In this Part, the Court examines whether mass, suspicionless containment and questioning violate the Fourth Amendment.

There are three general types of encounters between police and individuals: First, there is a "consensual encounter," which may be initiated by police without any objective level of suspicion, in which the individual willingly agrees to speak to police. Without more, a consensual encounter does not amount to a Fourth Amendment "seizure." *United States v. Cooper,* 43 F.3d 140, 145 (5th Cir. 1995) (citing *Florida v. Bostick*, 501 U.S. 429, 435 (1991)). Second, there is a "limited investigative stop," permissible under *Terry v. Ohio* if there is a "reasonable suspicion" that a person has committed or is about to commit a crime. *Id*. Third, there is an arrest, which must be based upon probable cause and justifies a "warrantless full-blown body search." *Id.* In determining whether or not a seizure has occurred for purposes of the Fourth Amendment, the Court must examine, in light of the totality of the circumstances, whether or not a reasonable person would have believed he or she was free to leave or to refuse to consent to the search the officers have requested. *See Florida v. Bostick*, 501 U.S. 429, 437 (1991); *United States v. Gonzales*, 79 F.3d 413, 420 (5th Cir.), *cert. denied*, 117 S. Ct. 183 (1996). The test is an objective one that looks to the police officer's conduct at issue and the setting in which it occurs. *Michigan v. Chesternut*, 486 U.S. 567, 573-74 (1988). This objective analysis, focusing on the officers and the

setting, allows the law enforcement officers to determine in advance whether their contemplated conduct will violate the Fourth Amendment. *Id.* Furthermore, the "reasonable person" test presupposes an *innocent* person. *Bostick*, 501 U.S. at 438.

"[S]topping an automobile and detaining its occupants constitute[s] a 'seizure' within the meaning of [the Fourth] Amendment[], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse,* 440 U.S. 648, 653 (1979). Seizures violate the Fourth Amendment only if they are unreasonable. *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (stating that the "touchstone of the Fourth Amendment is reasonableness" (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991))). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Id.* The Supreme Court and Fifth Circuit have long held that "warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions." *United States v. Ho*, 94 F.3d 932, 935 (5th Cir. 1996) (citing *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993)). In general, any restraint on a person amounting to a Fourth Amendment seizure is invalid unless justified by probable cause. *See United States v. Odutayo*, 406 F.3d 386, 390-91 (5th Cir. 2005). However, certain limited investigative stops, or detentions, known as *Terry* stops, are justifiable if there is a "reasonable, articulable suspicion that a person has committed or is about to commit a crime." *United States v. Chavez,* 281 F.3d 479, 485 (5th Cir. 2002); *see also Terry*, 392 U.S. at 21. Warrantless searches also are permissible when police receive voluntary consent to search by a person able to give such consent. *United States v. Solis,* 299 F.3d 420, 436 (5th Cir. 2002).

Defendants correctly urge that an investigative stop pursuant to *Terry v. Ohio* is legitimate if the officer has "reasonable suspicion" that the suspect has committed or is about to commit a crime. Reasonable suspicion is a standard which is "considerably easier for the Government to establish than probable cause." *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir. 1993), *cert. denied*, 114 S. Ct. 1630 (1994) (citing *United States v. Wangler*, 987 F.2d 228, 230 (5th Cir. 1993)). However, the reasonable suspicion standard renders searches and seizures unreasonable in the absence of *individualized* suspicion of wrongdoing. *See Chandler v. Miller*, 520 U.S. 305, 308 (1997). In the context of a *Terry* stop, an officer "must be able to point to *specific* and *articulable* facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21 (emphasis added); *accord United States v. Sokolow*, 490 U.S. 1 (1989); *Delaware v. Prouse*, 440 U.S. 648, 653-55 (1979).

It is only in very limited circumstances that the individualized reasonable suspicion requirement does not apply. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) (holding brief suspicionless detention of motorists at drug interdiction checkpoints violates Fourth Amendment). Police may not establish a program of mass detention with the sole and "primary purpose . . . to detect evidence of ordinary criminal wrongdoing." *See id.*; *Collins v. Ainsworth*, 382 F.3d 529, 538 (5th Cir. 2004) (applying *Edmond*); *see also Illinois v. Lidster*, 540 U.S. 419, 423 (2004) (upholding constitutionality of police roadblock where "[t]he stop's primary law enforcement purpose was *not* to determine whether a vehicle's occupants were committing a crime, but to ask vehicle occupants . . . for their help in

providing information about a [specific significant] crime in all likelihood committed by others"). The Supreme Court has "recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion." *Edmond,* 531 U.S. at 41; *see also id.* at 37 (citing *United States v. Martinez-Fuerte,* 428 U.S. 543 (1976) (upholding brief, suspicionless seizures of motorists at fixed border patrol checkpoint designed to intercept illegal aliens); *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444 (1990) (upholding sobriety checkpoint aimed at removing drunk drivers from road); *Delaware v. Prouse,* 440 U.S. 648 (1979) (suggesting roadblock with purpose of quickly verifying drivers' licenses and vehicle registrations would be permissible)); *Lidster,* 540 U.S. at 423-24 (differentiating between roadblocks justified by generalized interest in screening for a crime and roadblocks justified by police "information-seeking" about a specific, significant prior occurrence); *Collins,* 382 F.3d at 537-38, 543-44 (holding that sheriff's decision to institute license checkpoints on road leading to rap music concert had impermissible programmatic purpose). Each of the exceptions to the rule requiring individualized suspicion "was designed primarily to serve purposes closely related to the problems of policing the border, or to the necessity of ensuring roadway safety," *Edmond,* 531 U.S. at 41, or to "information-seeking" from the public, *Lidster,* 540 U.S. at 423-24. *See also Collins,* 382 F.3d at 538.

    Where the primary purpose of a mass detention is a "general interest in crime control," the Supreme Court has articulated a "presumptive rule of unconstitutionality." *See Lidster,* 540 U.S. at 424, 426. Where there are "special law enforcement concerns," such as

border control or preventing drivers from operating vehicles while intoxicated, suspicionless stops are subject to a reasonableness analysis. *See id.* at 424, 426-27. "[I]n judging reasonableness, we look to 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" *Id.* at 427 (quoting *Brown v. Texas,* 443 U.S. 47, 51 (1979)).

The Court now turns to the "zero tolerance policy" and the individual plans implementing "zero tolerance" and analyzes whether they violate these principles. The Court also examines whether Plaintiffs have raised a fact issue regarding approval by Chief Bradford of the individual plans as formal policy.

### D.    Analysis of Formal City Policies

Plaintiffs' first theory is that their civil rights were violated by a formal City policy of "zero tolerance," the Smith Plan, and/or the Jackson Plan. "Municipal liability under section 1983 requires proof of three elements:  a policymaker; an official policy; and a violation of constitutional rights whose "moving force" is the policy or custom." *Pineda v. City of Houston,* 291 F.3d 325, 328 (5th Cir. 2002); *see also Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir. 2001). "Under § 1983, a municipality or local governmental entity such as an independent school district may be held liable only for acts for which it is actually responsible." *Doe on Behalf of Doe v. Dallas Indep. Sch. Dist.,* 153 F.3d 211, 215-16 (5th Cir. 1998) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986); *Spann v. Tyler Indep. Sch. Dist.,* 876 F.2d 437, 438 (5th Cir. 1989)); *see also Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658, 694 (1978) (municipality may be held liable under

§ 1983 when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury"). A municipality cannot be held liable *solely* because it employs a tortfeasor. In other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory. *Monell,* 436 U.S. at 691.

For a municipality to incur liability under § 1983, its officers' "unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur." *Piotrowski,* 237 F.3d at 578. Ordinarily, such an official imprimatur is contained in duly promulgated policy statements, ordinances or regulations. *Id.* at 579. Under *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480-81 (1986), a "decision to adopt a particular course of action" may "represent[] an act of official government 'policy' as that term is commonly understood," provided that the action "is directed by those who establish governmental policy." "[W]hether a particular official has 'final policymaking authority' is a question of state law." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123 (1988). The parties agree that former Chief Bradford was at all pertinent times the individual with relevant policy-making authority for the HPD and thus the City.[34]

Plaintiffs have identified three primary "policies" that they contend were a "moving force" behind the constitutional violations they claim. Plaintiffs first allege that "zero

---

[34] *See* City of Houston Code of Ordinances, Ch. 34 § 34-23 (delegating responsibility for promulgating administrative rules and regulations governing the conduct of police and the police department to the chief of police); *see also Webster v. City of Houston,* 735 F.2d 838, 852-53 (5th Cir. 1984) (Williams, *et al.*, J.J., dissenting) (*en banc*).

tolerance" is a formal city policy, and that the City failed to adequately define the "zero tolerance" concept. They also claim, more specifically, that the Smith Plan and the subsequent Jackson Plan represent policies that were a "moving force" behind the constitutional violations they allege.[35] *See Pineda,* 291 F.3d at 328. Plaintiffs do not claim that a policymaker reviewed or approved the August 16 Game Plan prior to its execution.

The City and Bradford argue that, even assuming "zero tolerance" were official City policy, Plaintiffs offer no evidence that it is facially unconstitutional. In regard to the Smith Plan and the Jackson Plan, Defendants also argue that these Plans were not facially unconstitutional. Finally, Defendants argue that the Jackson Plan was not approved by a City policymaker. Defendants thus urge the Court to employ the law applicable to facially innocuous policies, arguing that Plaintiffs present no evidence that either "zero tolerance" or the Smith and Jackson Plans were promulgated with deliberate indifference to "known or

---

[35]   Plaintiffs also claim Rules 1.5, 1.7, and 1.8 of the HPD Rules Manual were a moving force behind their constitutional violations. Rule 1.5 provides that an officer who refuses to follow a lawful order can be disciplined for insubordination. Rule 1.7 states that if an officer receives an order that is contrary to a departmental policy or rule, he must first obey the order to the best of his ability, then appeal the order to the Chief of Police, without going through the chain of command. Rule 1.8 states that if an officer receives an order he knows to be unlawful, he must refuse to obey the order and report the order to the Chief by going through the chain of command. Plaintiffs argue that there is a conflict within the structure of the rules that puts police officers to a Hobson's choice when deciding whether to follow questionable orders. Although Plaintiffs complain of this general structure, they fail to explain how the rules are (1) facially unconstitutional; or (2) inevitably destined to lead to constitutional violations. Rule 1.5 clearly provides that officers are not to follow unlawful orders. In any event, these rules were rescinded in 1997. *See* Memorandum dated June 18, 1997 from C.O. Bradford, Revision of General Order 200-08 and Rescission of General Orders 200-30, 200-37, and Rules 1.2, 1.3, 1.5 through 1.9 and 2.1 through 2.9, Exhibit 22 to Defendants' Reply. Thus, these Rules cannot serve as a basis of municipal liability.

obvious" unconstitutional consequences, and that therefore municipal liability cannot attach under § 1983.

The Court first examines whether "zero tolerance" or the Smith or Jackson Plans were facially unconstitutional, and whether Plaintiffs have raised fact issues regarding whether these procedures represented official City policy. After concluding that the Jackson Plan was facially unconstitutional, the Court then turns to the issue of whether the facially constitutional "zero tolerance" policy and the Smith Plan could nevertheless support municipal liability as formal policies.

### 1.    Analysis of Facial Constitutionality of City Policies

An unconstitutional official policy renders a municipality liable under § 1983. *Piotrowski,* 237 F.3d at 579. If a policy is facially unconstitutional, the policymaker is deemed to have knowledge of the policy and the likelihood that constitutional violations will result from its fulfillment. *Burge v. St. Tammany Parish,* 336 F.3d 363, 369 (5th Cir. 2003). To establish whether this presumption applies, the Court must determine whether the policy in question is constitutional "on its face" – that is, by its written terms. *See, e.g., Monell v. Dep't of Social Servs.,* 436 U.S. 658, 661, 694-95 (1978) (policy of city compelling pregnant employees to take unpaid leaves of absence before such leaves were required by medical necessity violated plaintiffs' constitutional rights and gave rise to cause of action against the city pursuant to § 1983); *Gomillion v. Lightfoot,* 364 U.S. 339 (1960) (Alabama statute excluding 99% of blacks from voting was unconstitutional on its face); *Strauder v. West Virginia,* 100 U.S. 303 (1879) (West Virginia law prohibiting blacks from jury service *per*

*se* unconstitutional).  With this concept in hand, the Court examines whether the City's "zero tolerance" concept, as the term was used by the HPD, or the Smith or Jackson Plans, are facially constitutional.

### a.    "Zero Tolerance" Policy

Plaintiffs urge the Court to examine certain extrinsic evidence in order to determine the facial constitutionality of "zero tolerance" and its intended meaning in the context of the Operation ERACER plans.  Plaintiffs' suggested approach is inappropriate in the facial constitutionality inquiry.  As the Court has noted, in determining the facial constitutionality or unconstitutionality of a policy, the Court may look only at the text of the policy at issue. There is some evidentiary support for Plaintiffs' allegation that "zero tolerance" is a formal city policy.[36]  However, the evidence supporting Plaintiffs' claim that "zero tolerance" is a formal City policy does not support Plaintiffs' argument that "zero tolerance" is *facially* unconstitutional.[37]  There appears to be no HPD or other City document that defines the

---

[36]    *See* Deposition of Captain John Mokwa, Exhibit 2 to Plaintiffs' Response, at 97 (stating that "zero tolerance is an official policy"); Memorandum dated Oct. 5, 2001 from J.L. Breshears to Patrol Division Commanders (instructing that "zero tolerance" is valuable strategy, but such operations must be authorized by an officer of rank of captain or higher).

[37]    *See* Memorandum dated Oct. 5, 2001 from Executive Assistant Chief Operations Coordinator J.L. Breshears to Patrol Division Commanders, Zero Tolerance Operations, Exhibit 3 to Plaintiffs' Response.  The memorandum states in relevant part:

> The Houston Police Department believes that "Zero Tolerance" is a valuable strategy when utilized under controlled circumstances.  This letter serves as a reminder to patrol division commanders that Zero Tolerance operations must be authorized by someone of the rank of captain or higher.  You are to limit the use of Zero Tolerance operations to those situations that are most
>
> (continued...)

meaning of "zero tolerance."[38]   Contrary to Plaintiffs' assertions,[39] HPD's failure to define

"zero tolerance" is not evidence of facial unconstitutionality.   In the absence of such a

definition or other written description of the policy, the Court holds that the HPD "zero

tolerance" policy is not facially unconstitutional.[40]

## b.    The Smith Plan

There is evidentiary support for Plaintiffs' contention that the Smith Plan comprised

"official policy" of the City.   Ample evidence exists to suggest that the Smith Plan was

approved by Bradford himself.[41]  However, contrary to Plaintiffs' assertions, the Smith Plan

did not explicitly call for mass detention absent individualized suspicion.[42]   The Court

---

[37]        (...continued)
            appropriately dealt with by these tactics.

            When initiating Zero Tolerance operations, you are instructed to remind your
            officers to respect the individual rights of citizens and ensure that they are
            inconvenienced as little as possible.

[38]        *See* Deposition of C.O. Bradford, Exhibit 32 to Plaintiffs' Response, at 132.

[39]        *See* Plaintiffs' Response, at 20.

[40]        But, the "zero tolerance" policy may nevertheless be unconstitutional.   *See infra* Part
            III.D.2.a; Part III.E; Part III.F.

[41]        Deposition of C.O. Bradford, Exhibit 49 to Plaintiffs' Response, at 97-98.

[42]        The Smith Plan provided in relevant part:

            Operational Plan

            The second stage of the operation will consist of examination of all
            intelligence and evidence gathered during the course of the first stage.
            Following this examination process, suspects will be identified and criminal
                                                                        (continued...)

concludes that the Smith Plan was plainly not facially unconstitutional, although individual officers may have violated Plaintiffs' constitutional rights in carrying out the Plan.[43]

    **c.**     **The Jackson Plan**

In contrast, the Court concludes that the Jackson Plan included a facially unconstitutional mass detention component. There is no *direct* evidence that the Jackson Plan was approved by Bradford. Nevertheless, as detailed below, the Court concludes that Plaintiffs have presented sufficient circumstantial evidence to raise a genuine factual issue regarding whether Bradford personally approved the Jackson Plan. As a result, the City is not entitled to summary judgment on Plaintiffs' claim on the basis of the Jackson Plan as a facially unconstitutional policy.

The Jackson Plan, the blueprint for Operation ERACER, reflected a "general interest in crime control," with officers detaining everyone and scrutinizing for teen curfew

---

[42]     (...continued)

        charges will be prepared. Once to-be warrants are in hand, operation personnel will be separated into several arrest teams. These arrest teams will be supported by uniformed officers assigned to the Westside Patrol Division. Arrest teams will conduct zero tolerance sweeps through any identified street racing sites and/or staging areas. Officers will strictly enforce all State and Federal laws as well as all local ordinances. Officers will also execute the before mentioned to-be warrants. This zero tolerance and arrest process will be conducted during the final two weekends of the operation.

Smith Plan, at 3.

[43]     Although Captain Smith's subsequent evaluation of his street racing initiative (issued prior to Operation ERACER) states that measures involving mass containment and questioning were in fact used, there is no evidence Bradford approved that procedure in advance. *See* Smith Evaluation, at 3.

violations and public consumption of alcohol, as well as scrutinizing drivers' licenses, insurance, registrations, and vehicle inspection stickers.[44]  The Plan explicitly called for the same "zero tolerance" strategy of mass detention and scrutiny that had been employed in practice the Smith Initiative.[45]  The Jackson Plan identified the 8400 and 5700 blocks of Westheimer as targeted staging/racing locations.  However, the Plan did not include any requirement that all businesses on the targeted properties be closed to avoid capturing legitimate customers in the sweep.[46]  Moreover, the Jackson Plan did not require any officers to see street racing taking place on the August nights of the arrests or target vehicles that had

---

[44]     *See* Jackson Plan, at 3.  The Jackson Plan provided:

> Zero Tolerance will be the strategy utilized to combat this problem.  All exits to the area will be blocked and closed by units designated for containment.  All vehicles within the containment area will be inspected and scrutinized for violations.  Each vehicle will be directed toward a specified exit.  As the vehicles leave the containment area, they will be divided into groups.  Those identified as 'racers' will be arrested for the violations committed and the vehicles will be inventoried and towed to a certified storage lot.  Those vehicles containing juveniles or persons found to be consuming alcoholic beverages will be addressed in the same manner.  Those believed to be spectators should be directed toward the exit of a parking lot.  Once they are on the street, the drivers may be checked for driver's license and insurance.  The vehicles may be checked for registration and inspection sticker.  Citations will be issued for all violations discovered during the course of the operation.

*Id.*

[45]     *See* Smith Evaluation, at 3.

[46]     There is evidence that the planners knew or should have known that businesses were open at those locations during the times the Plan was to be implemented.  *See* Smith Plan, at 3; Jackson Plan, at 3 (listing 5700 and 8400 blocks of Westheimer Road – the locations of James Coney Island, K-Mart, and Sonic – as targeted sites); Game Plan, at 1 (describing how officers were to deal with detained "legitimate patrons of the open businesses").

been seen racing in June through the Smith Initiative surveillance.  Nor did the Plan even require officers to wait until they observed meaningful preparations for street racing.  Rather, the Plan provided that "[a]ll exits to the area will be blocked and closed by units designated for containment," and that "[a]ll vehicles within the containment area will be inspected and scrutinized for violations."[47]   Because the mass detention had the primary purpose of detecting ordinary crime, it is *per se* unconstitutional under *Edmond*.

Defendants retort that *Edmond* is distinguishable because HPD was acting pursuant to a specialized task of controlling street racers, a "purpose[] closely related to . . . the necessity of ensuring roadway safety," and not a generalized goal of controlling crime.  *See Edmond,* 531 U.S. at 42.  While it is true that the Jackson Plan had a specific task of combating street racing and its associated ills, this type of criminal activity does not fit the narrow circumstances defined by the Supreme Court (*i.e.,* border control, driver sobriety, information-seeking to solve a significant crime) under which law enforcement agents are not constrained by the requirement of individualized suspicion.  *See id.*; *Lidster*, 540 U.S. at 423-24.  Unlike driver intoxication, it is perfectly apparent without stopping a car whether the car is engaged in street racing.  Moreover, in *Edmond,* the Supreme Court held that even drug interdiction checkpoints, aimed at catching narcotics violations, were impermissible because they served a "general interest in crime control," and distinguished the narcotics checkpoints from programs aimed at "ensuring roadway safety."  *See id.*  In light of *Edmond,*

---

[47]     Jackson Plan, at 3.

Jackson's plan to detain all persons within the containment area, with no regard for the existence of open businesses and their customers, is facially unconstitutional.[48]

Although the Jackson Plan is subject to *Edmond's* presumptive rule, the Court nevertheless conducts a *Brown* reasonableness analysis and concludes that the Plan fails this test as well. *See Lidster,* 540 U.S. at 424, 426 (stating that where "special law enforcement concerns" exist, suspicionless stops are subject to a reasonableness analysis under *Brown v. Texas,* 443 U.S. at 51). "[I]n judging reasonableness, we look to 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" *Id.* at 427 (quoting *Brown,* 443 U.S. at 51).

Street racing is not a problem that falls within the Supreme Court's narrow exceptions to the rule against suspicionless stops.  Even if racing were so significant a problem, the manner in which the way the Jackson Plan addressed the problem is unjustifiable under the Fourth Amendment.  Undoubtedly, street racing presents a serious public concern.  However, it is not a crime in Texas or Houston to – deliberately or accidentally – witness a street race. Plans to detain everyone to screen for various crimes do little to advance the public interest in curbing street racing.  The best way to stop street racing would be repeatedly to target the racers themselves.  Finally, and most importantly, the Jackson Plan's interference with individual liberty was extremely severe.  The Plan called for everyone to be trapped in the

---

[48]    The Court does not hold that detentions or arrests of actual street racers would be unconstitutional.

parking lots of eleven locations – some of which contained businesses open twenty-four hours a day – with all vehicles "inspected and scrutinized for violations."  It called for officers to "document each and every person they have encountered."  The detentions in the Jackson Plan were vastly different from a brief sobriety or immigration checkpoint.  The Jackson Plan contemplated lengthy detention and invasive searches.  It reflected an unjustified, almost totalitarian, "regime of suspicionless stops," *Edmond*, 531 U.S. at 41, and was completely inconsistent with the Fourth Amendment rights Americans hold dear.

Defendants argue that, even without individualized reasonable suspicion, the planned detentions were constitutional because the standard for the detentions was neutral and articulable – detain everyone.  *See Prouse,* 440 U.S. at 663.  In *Prouse,* the Court held that discretionary, suspicionless stops of automobiles for the purpose of verifying license and registration were unconstitutional, but suggested in *dicta* that questioning every car, as opposed to randomly selected cars, in the oncoming traffic would not be unconstitutional. *See id*.  This argument is rejected on the facts at bar.  The mere fact that the Plan called for *everyone* found in shopping centers' parking lots to be subjected to search and seizure does not in any way avoid the constitutional infirmity to salvage the Jackson Plan.  Defendants' contention that mass suspicionless searches – no matter the severity of the interference with individual liberty – are permissible so long as everyone is treated equally unjustly is unsupported in law and entirely unpersuasive.

Defendants also argue that the planned investigative detentions were "temporary and last[ed] no longer than . . . necessary to effectuate the purpose of the stop," as required by

*Florida v. Royer,* 460 U.S. 491, 500 (1983).  The Court again remains unpersuaded.  The Jackson Plan did not specify a time limit to complete the investigative detentions, but the record indicates that some people were detained for as long as two hours during the execution of the prior Smith Initiative, and much longer the nights Operation ERACER was implemented.  In *Royer,* the plaintiff was detained for approximately fifteen minutes and was arrested as a result of the stop.  *Id.* at 495.  The *Royer* Court found that the stop unconstitutional, in part because the Court found the detention more intrusive than necessary. *Id.* at 504; *see also Lidster,* 540 U.S. at 422 (upholding stops of ten-to-fifteen seconds); ; *Sitz,* 496 U.S. at 448 (upholding delays of 25 seconds); *Martinez-Fuerte,* 428 U.S. at 547 (upholding stops of three-to-five minutes).  Detaining for hours all persons found in a parking lot under the circumstances presented simply because they were in the lot when police arrived is not reasonable under the Fourth Amendment.

Defendants also argue that the Jackson Plan was not suspicionless because it called for establishment of reasonable suspicion through a surveillance component.  This argument is unavailing.  First, it ignores a crucial component of the Plan.  The Jackson Plan called for confinement of *all* persons at the sites listed, not confinement of only the specific persons observed or even suspected to have violated laws.  Second, the surveillance on which the Plan apparently relied was from two months earlier, with no provision that the offenders in June would be the ones arrested or detained in August.  The Supreme Court has held that detaining officers must establish a "particularized and objective basis" for the reasonable suspicion of wrongdoing for each individual detainee. *United States v. Arvizu*, 534 U.S. 266,

273 (2002) (citing *United States v. Cortez,* 449 U.S. 411, 417 (1989)). Defendants point out that detention is constitutional when police establish reasonable suspicion that criminal activity may be in progress based on their observation of unusual conduct, and when the officers are able to identify specific facts that justify their suspicion. *Terry,* 392 U.S. at 30-31. Defendants assert that officers may use their special training and familiarity with the area and its citizens, and under the totality of circumstances assess the required "reasonable suspicion" needed for a constitutional detention. *See Arvizu*, 534 U.S. at 275.

Defendants argue that the plans at issue were based upon the requisite reasonable suspicion because HPD acquired knowledge about street racing activities at the selected sites through the use of undercover surveillance officers in the weeks prior to the events here at issue. Defendants argue that, through covert surveillance, HPD officers observed conduct that gave rise to reasonable suspicion that criminal activity was taking place, and were able to identify specific facts that justified that suspicion. *See Terry*, 392 U.S. at 30-31. Thus, Defendants argue, the planned detentions were not suspicionless and did not violate Plaintiffs' constitutional rights. *See Edmond*, 531 U.S. at 39-41. The Court is not persuaded.

The City does not detail the results of the surveillance on which it relies. However, there is no evidence that, at Operation ERACER's planning stage in July 2002, the surveillance from evenings in June gave rise to individualized reasonable suspicion regarding the *specific* persons who eventually were detained at HPD's targeted sites in August. The time frame between the surveillance and arrests was least weeks, if not months. There is no evidence HPD knew which specific individuals would be present on August 16-18, let alone

who would commit a crime or be poised to do so in August.  Nevertheless, the Jackson Plan explicitly called for a cone pattern traffic flow, which ensured that every car who happened to be in a targeted parking lot would be forced through a specified exit, where HPD officers would stop and investigate each vehicle and its occupants.[49]  The requirement for the confinement of all persons is inconsistent with Defendants' contention that the Plan required reasonable, individualized suspicion.[50]

Aside from relying on the Jackson Plan as written, Defendants argue that reasonable suspicion was in fact established on the scene on the nights in question.  Defendants argue that reasonable suspicion arose for the events in question because Plaintiffs were part of a large crowd gathered at 12:00 a.m. on private property with loud music playing and smoke in the air.  Defendants do not identify for the Court any evidence to establish that Plaintiffs in this case were part of an illegally gathered – or even suspicious – crowd.  Plaintiffs, on the other hand, offer evidence that they were legitimate customers present at open businesses.  Reasonable suspicion must be based on something more than a vague or generalized hunch.  It is not enough for a subject of suspicion to be, for example, merely present in a location known for a high incidence of crime.  *See Brown v. Texas*, 443 U.S. 47, 51-52 (1979).  Plaintiffs have shown a genuine fact issue exists regarding whether officers

---

[49]     *See* Jackson Plan, *passim.*

[50]     *See id.*

had any particularized suspicion of Plaintiffs in the instant case on the evenings in question, and whether any such suspicion was reasonable.[51]

Furthermore, there exists a genuine issue of material fact regarding whether Bradford approved the Jackson Plan. Such an approval would render the Jackson Plan an "official policy" of the City. There is evidence that suggests he did approve the Jackson Plan, at least in its essence. Bradford approved the Smith Plan, and stated that it would be the model plan[52]; Bradford delegated authority to Breshears to address the street racing problem[53]; Breshears kept Bradford generally apprised of what was going on with regular weekly meetings, in addition to phone calls and daily meetings as needed[54]; McClelland told Bradford and Breshears that he was going to run a street racing initiative[55]; McClelland was, at a minimum, required to obtain approval from Breshears to implement any such plan[56]; McClelland gave approval to Aguirre to devise a plan to address street racing, which

---

[51]   Defendants also contend that Plaintiffs' arguments regarding unlawful detention should be ignored because Plaintiffs urge the wrong standard. It is true that Plaintiffs, after setting forth the correct rule of *Edmond*, go on to urge that City plans included detention without "probable cause," and the proper standard for a *Terry* stop is "reasonable suspicion." Plaintiffs' error is immaterial because the Jackson Plan called for detention without individualized suspicion, which is unreasonable except under limited circumstances.

[52]   Deposition of C.O. Bradford, Exhibit 49 to Plaintiffs' Response, at 97-98; Deposition of C.O. Bradford, Exhibit 60 to Plaintiffs' Response, at 35-36, 39, 98.

[53]   Deposition of C.O. Bradford, Exhibit 59 to Plaintiffs' Response, at 26-27, 97; Deposition of J.L. Breshears, Exhibit 63 to Plaintiffs' Response, at 137.

[54]   Deposition of J.L. Breshears, Exhibit 63 to Plaintiffs' Response, at 137.

[55]   Deposition of C.A. McClelland, Exhibit 70 to Plaintiffs' Response, at 125, 127; Deposition of C.O. Bradford, Exhibit 61 to Plaintiffs' Response, at 44.

[56]   Deposition of C.O. Bradford, Exhibit 62 to Plaintiffs' Response, at 45-46.

responsibility Aguirre delegated to Jackson, who drafted the Jackson Plan[57]; and, according to Aguirre, McClelland told him that Bradford knew of Aguirre's plan to conduct Operation ERACER, and that Bradford removed the traffic detail component from the operation, something Bradford could not have done if he were unaware of the Plan.[58]  In addition, the Jackson Plan called for extensive resources, which is further circumstantial evidence that Chief Bradford would have been involved with the Plan.[59]  Given Aguirre's testimony, the close virtually daily contact between Bradford and Breshears, together with the requirement that McClelland obtain approval from Breshears, and resolving all doubts in favor of Plaintiffs, a jury would be permitted to draw from this circumstantial evidence a reasonable inference that Bradford knew and approved of the Jackson Plan.  Furthermore, given that the Jackson Plan called for the detention of all persons found in targeted locations and that Plaintiffs were in fact detained, there is obviously a fact issue regarding whether the Plan was a moving force behind the violation of Plaintiffs' constitutional rights.  Thus, Plaintiffs have raised genuine fact issues that defeat the City's summary judgment motion to the extent Plaintiffs claim that the Jackson Plan was a formal City policy.

---

[57]     Deposition of C.A. McClelland, Exhibit 41 to Plaintiffs' Response, at 120; Deposition of M.A. Aguirre, Exhibit 42 to Plaintiffs' Response, at 70; Deposition of F.S. Jackson, Exhibit 44 to Plaintiffs' Response, at 19-20.

[58]     Deposition of M.A. Aguirre, Exhibit 58 to Plaintiffs' Response, at 280.

[59]     *See* Jackson Plan, at 4 (calling for use of 55 officers and commanders).

### 2.   Analysis of Constitutionality of Facially Innocuous City Policies

Because it is by no means certain that Plaintiffs will be able to establish at trial that the facially unconstitutional Jackson Plan was approved by Bradford and thus was official City policy, the Court will also address the parties' remaining arguments regarding the facially innocuous "zero tolerance" policy and Smith Plan.  Defendants argue there is insufficient evidence to support Plaintiffs' claim that "zero tolerance," as the term is intended by the City's official policy, calls for City police officers to perform unconstitutional actions. Defendants also argue that there is insufficient evidence to support a claim that the Smith Plan called for such unconstitutional actions.

A facially innocuous policy may support liability only if "promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result."  *Piotrowski,* 237 F.3d at 579 (quoting *Brown,* 520 U.S. at 403) ("Deliberate indifference . . . is a stringent test, and 'a showing of simple or even heightened negligence will not suffice' to prove municipal culpability.").  A heightened standard of proof applies to Plaintiffs' claims regarding a facially innocuous policy.  *See, e.g., Victoria W. v. Larpenter,* 369 F.3d 475, 482 (5th Cir. 2004) (quoting *Brown,* 520 U.S. at 405) ("[W]hen the claim is that while a municipal policy itself did not violate federal law, it caused another actor to inflict the injury, 'rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.'").

### a.    "Zero Tolerance" Policy

There is no evidence in the record regarding just what "zero tolerance" was understood to mean at the time the "zero tolerance policy" was promulgated.  There is no document that defines the meaning of "zero tolerance" within the City of Houston.[60]  Nor is there evidence or a suggestion that, at the time the "zero tolerance policy" was *promulgated*, "zero tolerance" would obviously result in, let alone was known to result in, constitutional violations.  "Zero tolerance" therefore cannot support City liability as a formal policy.

### b.    The Smith Plan

To the extent the Smith Plan is deemed a formal City policy, there is no evidence that unconstitutional consequences were known or obvious at the time of its promulgation.  The Smith Plan provided for three weeks of covert actions, specifically surveillance to establish probable cause, as well as for the obtaining of arrest warrants, before the overt phases of the operation.  The Smith Plan included no suggestion of mass detentions of spectators or otherwise.[61]  In any event, the Smith Plan, as a formal policy, has not been shown to be the causal moving force behind Plaintiffs' injuries because there is no evidence that it was used in Aguirre's Operation ERACER on the weekend of August 16-18, 2002.  *See Piotrowski,* 237 F.3d at 580 ("There must be a direct causal link between the municipal policy and the constitutional deprivation."); *see also Larpenter,* 369 F.3d at 482 (requiring "rigorous standards of culpability and causation").  Although the Smith Plan may eventually have

---

[60]    Deposition of C.O. Bradford, Exhibit 32 to Plaintiffs' Response, at 132.

[61]    *See generally* Smith Plan.

41

formed a basis for Operation ERACER, the Smith Plan was promulgated for use in the Smith

Initiative, with overt operations initially set for the weekends of June 21 and June 28, 2002.[62]

The Smith Plan set forth a time-limited initiative and cannot, by itself, result in City liability

for events transpiring at a subsequent initiative.[63]   Because "zero tolerance" and the Smith

Plan as formal City policies do not result in legally cognizable claims, the Court next

analyzes whether the second approach under *Monell*, 436 U.S. at 694, HPD's customary use

of "zero tolerance," could support municipal liability.[64]

### E.    Analysis of Informal Policy:  Evidence of Recurring Pattern to Show a Custom or Practice

Even if a policy is not formally approved by a City policymaker, municipal liability

may result from "[a] persistent, widespread practice of city officials or employees which,

although not authorized by officially adopted and promulgated policy, is so common and

well settled as to constitute a custom that fairly represents municipal policy." *Pineda v. City

of Houston,* 291 F.3d 325, 328 (5th Cir. 2002).   Without proof of a recurring pattern, a claim

based upon a customary policy must fail.  *See Piotrowski v. City of Houston,* 237 F.3d 567,

581 (5th Cir. 2001) ("A customary municipal policy cannot ordinarily be inferred from single

constitutional violations.")   "Isolated violations are not the persistent, often repeated,

---

[62]     *See id.* at 2; *see also* Smith Evaluation.

[63]     The Court considers below the issue of whether the Smith Plan, as written and executed, supports liability as evidence of HPD custom.

[64]     The Court does not analyze the Jackson Plan as a facially innocuous policy because it concluded that the Jackson Plan is facially unconstitutional in *supra* Part III.D.1.c.

constant violations, that constitute custom and policy as required for municipal section 1983 liability." *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984).  For liability to attach on this basis, actual or constructive knowledge of the custom must be attributable to the governing body of the municipality or to an official with policy-making authority. *Pineda,* 291 F.3d at 328.  Plaintiffs in their Fourth Amended Complaint claim that the "zero tolerance policy," within HPD at the relevant time, was customarily understood to mean "arrest without probable cause."  In their Response to Defendants' Motion, Plaintiffs also argue that "zero tolerance," in practice, was also understood to mean "detain without reasonable suspicion."  The Court addresses these claims in turn.[65]

### 1.    Arrest Without Probable Cause

Plaintiffs argue that by HPD custom, "zero tolerance"[66] encompassed the arrest of persons in the absence of probable cause.  If proven, such a customary policy or practice could result in municipal liability under § 1983.  "[A]n arrest . . . constitutes a seizure under the Fourth Amendment" and must be accompanied by probable cause.  *U.S. v. Williams,* 365 F.3d 399, 403-04, (5th Cir. 2004).  It is unconstitutional to engage in mass arrests without probable cause as to each individual.  *See, e.g., Maryland v. Pringle,* 540 U.S. 366 (2003)

---

[65]     Plaintiffs attempt to raise a fact issue concerning whether Aguirre and Bradford viewed "zero tolerance" to mean mandatory incarceration for violators or a combination of incarceration and citations. *See* Plaintiffs' Response, at 10-13, 20 (citing *Fields v. City of South Houston,* 922 F.2d 1183 (5th Cir. 1991)).  Because it is constitutional to arrest, with probable cause, those suspected of committing misdemeanors, *see Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001), this issue is irrelevant.

[66]     Plaintiffs here point collectively to Operation ERACER (as implemented and as evidenced by the Game Plan), as well as the Jackson Plan, the written basis for that operation, as the most recent illustration of the informal "zero tolerance" policy.

(a "person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause"); *Barham v. Ramsey,* 338 F. Supp. 2d 48 (D.D.C. 2004) (in absence of dispersal order to group gathered in park, police official's belief that some in group had broken laws did not provide probable cause for mass arrest of entire group, such that official was not entitled to qualified immunity under § 1983); *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968).

Defendants argue that Plaintiffs have no evidence of a custom of eliminating probable cause for mass arrests pursuant to a "zero tolerance policy."  Plaintiffs attempt to counter this contention by pointing to several prior alleged "zero tolerance" operations by HPD.[67]  The Court concludes that there is no proof of a pattern or series of incidents demonstrating that HPD has a custom or policy to arrest without probable cause.  Plaintiffs assert that the City had a custom of arresting individuals without probable cause at "zero tolerance" operations such as the "Gulfton Ghetto Project," the "Stella Link/Death Valley" initiative, and "Operation: Renaissance."[68]  Plaintiffs point to testimony of "hundreds of arrests,"[69] but do not identify for the Court any evidence regarding the purpose and procedures involved in any

---

[67]   Defendants contend that Plaintiffs rely on opinions of Steven D. Ashley, their proffered law enforcement expert, to support Plaintiffs' positions. However, in fact, Plaintiffs only rely in their summary judgment briefing on Ashley in connection with their "negligent supervision" (*i.e.,* failure to supervise) claims, which the Court has held are not pleaded and thus not actionable in this case.  Accordingly, the Court does not address the admissibility of Ashley's opinions.

[68]   Deposition of M.A. Aguirre, Exhibit 73 to Plaintiffs' Response, at 273-74.

[69]   Deposition of M.A. Aguirre, Exhibit 21 to Plaintiffs' Response, at 274-75 (quoted *infra* at 47-48).

of these initiatives, the practices by HPD officers regarding probable cause during these operations, nor the circumstances of the arrests.  Nor do Plaintiffs present evidence of citizen or business complaints regarding these operations, complaints to HPD's Internal Affairs Division ("IAD") or IAD investigations regarding these operations, large numbers of dismissed charges associated with these operations, or warnings from municipal attorneys advising HPD or any of its officers that illegal arrests had been effected.  Plaintiffs thus have presented no evidence of a pattern of mass arrests without probable cause pursuant to a "zero tolerance policy."

Defendants further highlight the weakness of Plaintiffs' position by citing to uncontradicted testimony of numerous police officials and officers who claim HPD has never had a custom, practice, or policy of arrests without probable cause.[70]  Aguirre has testified that probable cause was not suspended for Gulfton, Renaissance, or Death Valley, and that "zero tolerance" does not require the elimination of probable cause.[71]  Thus, Plaintiffs fail to meet their summary judgment burden with evidence of any pattern or series of incidents indicating that the City through HPD had a custom or practice of arresting individual without

---

[70]  *See* Deposition of C.O. Bradford, Exhibit 4 to Defendants' Motion, at 12-16; Deposition of J.L. Breshears, Exhibit 11 to Defendants' Motion, at 5-8 (Executive Assistant Chief of Police); Deposition of M.A. Aguirre, Exhibit 3 to Defendants' Motion, at 20-25; Deposition of F.S. Jackson, Exhibit 9 to Defendants' Motion, at 7-19 (lieutenant responsible for planning Operation ERACER).  In addition, other significant evidence indicates that "zero tolerance" has never been understood to include arrest without probable cause.  *See* Deposition of M.A. Aguirre, Exhibit 3 to Defendants' Motion, at 202, 333-34 (stating that "zero tolerance" does not entail making arrests without probable cause); *id* at 197 (testifying he is aware of no custom, practice or policy of condoning arrests without probable cause); other testimony cited in Defendants' Motion, at 15-16.

[71]  Deposition of M.A. Aguirre, Exhibit 4 to Defendants' Reply, at 333-34.

probable cause during "zero tolerance" operations.  Plaintiffs' claims against the City for a policy, practice or custom of arrests without probable cause are therefore dismissed.

### 2.      Detention Without Reasonable Suspicion

Plaintiffs rely on the informal HPD "zero tolerance" policy for their Fourth Amendment claim against the City concerning their unlawful detentions.[72]  As the Court has articulated above in this Part, municipal liability may result from "[a] persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Pineda,* 291 F.3d at 328.  For liability to attach on this basis, "[a]ctual or constructive knowledge of [the] custom must be attributable to the governing body of the municipality or to an official [with] policy-making authority."  *Id.* (citing *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (*en banc*)).

Plaintiffs argue in their Response to Defendants' Motion that "zero tolerance" was not defined within HPD, but was understood to include detention without reasonable suspicion, a Fourth Amendment violation.  Plaintiffs present documentary and deposition evidence, which they argue raises fact issues regarding:  (1) a pattern of detention without reasonable suspicion pursuant to "zero tolerance" operations; and (2) Bradford's (and thus, the City's) actual or constructive knowledge of this practice.

---

[72]      As evidence of this informal policy, Plaintiffs rely on the Smith Initiative and earlier "zero tolerance" operations, as well as the fact that Operation ERACER took place over three different nights.

Plaintiffs' evidence includes the testimony of Lieutenant F.S. Jackson (author of the Jackson Plan) and Aguirre, as well as the written Smith Evaluation and the Jackson Plan. Jackson testified in deposition regarding "zero tolerance":

> Q:    [Y]ou've testified earlier that your definition of Zero Tolerance included the concept of detaining, if you will, everyone to determine if there's a violation of law and it included writing citations as to – opposed to just pure arrest everyone, correct?
>
> A:    Yes, sir.  Basically my definition of Zero Tolerance was that everyone was subject to scrutiny.  If they were found in violation of the law, that they would be either arrested or issued a citation; and that if they were not in violation, then they would – they would be released.[73]

This "zero tolerance" practice of "scrutiny" of "everyone" via temporary detention is supported by the testimony of Aguirre, who participated in "the three largest zero tolerance programs" in HPD history – the "Gulfton Ghetto Project," the "Stella Link/Death Valley" initiative, and "Operation: Renaissance."[74]  Aguirre testified in deposition:

> Q:    [B]y definition does zero tolerance mean that there will be differentiation from the standard everyday policies of the Houston Police Department?
>
> A:    Yes, absolutely.
>
> Q:    Now, in the Stella Link zero tolerance operation, were there arrests?
>
> A:    Hundreds.
>
> Q:    And was there approved deviation from the everyday policies and procedures of the City of Houston?

---

[73]    Deposition of F.S. Jackson, Exhibit 20 to Plaintiffs' Response, at 163-64.

[74]    Deposition of M.A. Aguirre, Exhibit 73 to Plaintiffs' Response, at 273-74.  As noted above, the evidence submitted by the parties does not indicate what these initiatives involved.

A:     Very much so. *We erected wooden horses across Stella Link Avenue and all the side streets where people had to sign in. It was a gulag type situation where you had to sign in and sign people out and everyone else within the contained perimeter was subjected to zero tolerance enforcement techniques.*

Q:     And what about the Gulfton project, were there arrests in that project?

A:     Hundreds of arrests, hundreds.

Q:     And was there deviation from the everyday policies and procedures in the City of Houston because it was a zero tolerance project?

A:     Yes.

Q:     And in the Renaissance zero tolerance project, were there arrests?

A:     Thousands upon thousands upon thousands.[75]

Although Aguirre admits that probable cause was not suspended for the prior "zero tolerance" operations in which he had participated,[76] his testimony indicates that in HPD parlance, the policy of "zero tolerance" was understood to mean the cordoning off of a specific area, containment of all persons within, and the subjecting of all persons present to "scrutiny" and thus detention to determine who was in violation of a law.

Plaintiffs' evidence also suggests that, in accordance with this understanding, the Smith Plan called for use of "zero tolerance sweeps through any identified street racing sites and/or staging areas."[77]   After the Smith Initiative was complete, in July 2002, Smith

---

[75]     Deposition of M.A. Aguirre, Exhibit 21 to Plaintiffs' Response, at 274-75 (emphasis added).

[76]     *See* Deposition of M.A. Aguirre, Exhibit 4 to Defendants' Reply, at 333-34.

[77]     Smith Plan.

described in his evaluation that police vehicles had been used to "effectively block all exits" for an "excess of three hundred and fifty vehicles" and their occupants, that at the scene, a "single exit, manned by both uniformed and plainclothes officers was created," and that all persons at the scene were effectively detained, "[t]he occupants of each vehicle were interviewed within a period of less than two hours, and the scene was cleared."[78]  Thus, Plaintiffs' evidence indicates that "zero tolerance" in the weeks leading up to Operation ERACER was understood to include the mass detention and questioning of, potentially, hundreds of persons, without regard to whether there was reasonable suspicion or probable cause to believe they were violating any laws at the time of their detention.  This problem was exacerbated, Plaintiffs argue, by the lack of a written definition for "zero tolerance."

As this Court has previously concluded, the specific blueprint for Operation ERACER, the Jackson Plan, called for the same "zero tolerance" strategy of mass detention and scrutiny that had transpired in the Smith Initiative.[79]  The Jackson Plan provided that "[a]ll exits to the area will be blocked and closed by units designated for containment," and that "[a]ll vehicles within the containment area will be inspected and scrutinized for violations."[80]  The Plan did not require that all the businesses using the parking lots in issue be closed, or otherwise direct officers to distinguish between customers of open businesses

---

[78]     Smith Evaluation.

[79]     *See supra* Part III.D.1.c.

[80]     Jackson Plan, at 3.

and others.[81]  The sites listed in the Jackson Plan included establishments that Bradford and his designated policymakers allegedly knew or should have known were open for business at the time of the operation, resulting in the likely detention of legitimate customers who were not in violation of any laws.[82]

Challenging the quality and quantity of Plaintiffs' evidence regarding an illegal custom, Defendants assert that Plaintiffs must demonstrate "[s]ufficiently numerous prior incidents of police misconduct" in order "to prove a custom *and accession to that custom by the municipality's policymakers*.  Isolated instances . . . are inadequate to prove knowledge and acquiescence by a policymaker."  *See McConney v. City of Houston,* 863 F.2d 1180, 1184 (5th Cir. 1989) (emphasis added).  Defendants assert that the Jackson and Aguirre quotes upon which Plaintiffs rely were "taken out of context" and "inadequately developed" by the examiners.  They also argue that there is no evidence that wooden horses were used for containment at the Gulfton or Renaissance initiatives.   Although wooden horses were apparently used at Stella Link, Defendants argue that operation should be ignored because it took place in June 1989.  These challenges to the "quality" of Plaintiffs' evidence create factual disputes the Court cannot decide on summary judgment.

---

[81]    *See id.*

[82]    Interestingly, the IAD Summary states that on April 18, 2002, Bradford praised Aguirre's oral proposal that HPD deal with street racing by "implementing Zero Tolerance tactics, mass arrests, and towing vehicles."  Investigation Summary, Exhibit 5 to Plaintiffs' Response, at 208.  Arguably, this bolsters Plaintiffs' claim that the concept of mass detentions was subsumed within the "zero tolerance" procedures that Bradford approved of.

Defendants also attack the quantity of Plaintiffs' evidence, arguing that Plaintiffs cannot meet their summary judgment burden because they have no evidence of:   prior community complaints concerning unlawful mass detentions; IAD complaints; inordinate dismissals by prosecutors of charges filed; communications from government prosecutors warning of the unconstitutionality of "contain and scrutinize" detention; "lax discipline"; or prolonged public discussion of abuse or a high degree of publicity concerning unlawful mass detentions.  In addition, Defendants point out that Plaintiffs present no expert opinion on their detention claim.  In support of their arguments regarding the types of evidence Plaintiffs should have presented, Defendants cite *Pineda*, 291 F.3d at 330, *Grandstaff v. City of Borger,* 767 F.2d 161, 171 (5th Cir. 1986), and *Zuchel v. City and Cty. of Denver,* 997 F.2d 730, 740-41 (10th Cir. 1993).  These cases are materially distinguishable.

*Pineda*'s suggestion that public discussion or publicity regarding constitutional violations could demonstrate constructive knowledge are listed by way of example and not limitation.  *Pineda* states that "[c]onstructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities as, *for example,* where the violations were so persistent and widespread that they were the subject of prolonged public discussion or a high degree of publicity." *Pineda*, 291 F.3d at 330 (emphasis added).  Indeed, the *Pineda* court confirmed that "[c]onstructive knowledge may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these." *Id*. n.15 (quoting *Spell v.*

*McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987)).   The *Grandstaff* court held that
"subsequent acceptance of dangerous recklessness by [a] policymaker tends to prove his
preexisting disposition and policy," but it did not hold that such ratification is the only means
of proving such a policy.  *Grandstaff*, 767 F.2d at 171.  Rather, in the context of the facts of
that case, the municipal police chief's failure to react to a single incident of gross police
misconduct "sa[id] more about the existing disposition of the City's policymaker than would
a dozen incidents where individual officers employed excessive force."  *See id.  Zuchel* held
that evidence that the city failed to implement certain recommendations for police training,
as suggested by the district attorney, was sufficient to support a jury's finding of a
policymaker's deliberate indifference to the plaintiff's constitutional rights.  *Zuchel*, 997 F.2d
at 740-41.  *Zuchel* did not hold that a municipality may be liable under § 1983 *only* if it
ignores such recommendations.

    Although the types of evidence urged by Defendants in this case would certainly assist
Plaintiffs, the Court concludes that Plaintiffs have met their summary judgment burden to
produce evidentiary support sufficient to raise a genuine fact issue that the City through its
policymaker Bradford had actual or constructive knowledge of plans to detain persons
without individualized suspicion, pursuant to a "zero tolerance policy."   The evidence
indicates that, prior to Operation ERACER, "contain and scrutinize" detention was used on
at least two occasions in connection with "zero tolerance" operations, the Stella Link

Initiative and the Smith Initiative.[83]  Furthermore, Plaintiffs can point to similar incidents of wrongful detention three nights in a row on August 16, 17, and 18.  The evidence also indicates Bradford himself approved the use of "zero tolerance" for street racing initiatives earlier in the summer of 2002.[84]  As the Court has observed above,[85] there is also evidence that Bradford delegated authority to Breshears to address the street racing problem[86]; Breshears kept Bradford generally apprised of what was going on with regular weekly meetings, in addition to phone calls and daily meetings as needed[87]; McClelland told Bradford and Breshears that he was going to run a street racing initiative[88]; McClelland was, at a minimum, required to obtain approval from Breshears to implement any such plan[89]; McClelland gave approval to Aguirre to devise a plan to address street racing, which

---

[83]     The record is unclear if the "contain and scrutinize" approach was used in the other operations on which Plaintiffs rely, and thus the Court does not rely on those operations. Interestingly, however, that Defendants do not submit evidence that mass detentions did not occur.

[84]     Deposition of C.O. Bradford, Exhibit 1 to Plaintiffs' Response, at 97-98 (testifying that as long as ERACER plans complied with the Smith Plan, which he had approved, there was no need to obtain further approval); Deposition of M.A. Aguirre, Exhibit 3 to Defendants' Motion, at 34-49 (testifying that Bradford was aware of and supported Aguirre's Operation ERACER plan).

[85]     See supra Part III.D.1.c,

[86]     Deposition of C.O. Bradford, Exhibit 59 to Plaintiffs' Response, at 26-27, 97; Deposition of J.L. Breshears, Exhibit 63 to Plaintiffs' Response, at 137.

[87]     Deposition of J.L. Breshears, Exhibit 63 to Plaintiffs' Response, at 137.

[88]     Deposition of C.A. McClelland, Exhibit 70 to Plaintiffs' Response, at 125, 127; Deposition of C.O. Bradford, Exhibit 61 to Plaintiffs' Response, at 44.

[89]     Deposition of C.O. Bradford, Exhibit 62 to Plaintiffs' Response, at 45-46.

responsibility Aguirre delegated to Jackson, who drafted the Jackson Plan[90]; and, according to Aguirre, McClelland said that Bradford knew of Aguirre's plan to conduct Operation ERACER, and that Bradford removed the traffic detail component from the operation – which was originally to perform the containment function – something Bradford could not have done if he were unaware of the Plan.[91]   In addition, the Jackson Plan called for extensive resources, which is further circumstantial evidence that Chief Bradford would have been aware of the Plan.[92]   Given Aguirre's testimony, the close, virtually daily contact between Bradford and Breshears, together with the requirement that McClelland obtain approval from Breshears, and resolving all doubts in favor of Plaintiffs, a jury would be permitted to draw a reasonable inference that Bradford was aware of the planned Operation ERACER, approved of the use of "zero tolerance" for operation ERACER, and knew or should have known that such tactics might include a "contain and scrutinize" component.

The Court concludes that, taken as a whole, Plaintiffs' evidence raises a material fact issue regarding whether "zero tolerance" was understood within HPD to encompass the detention of large groups of individuals without individual suspicion, and merely to

---

[90]   Deposition of C.A. McClelland, Exhibit 41 to Plaintiffs' Response, at 120; Deposition of M.A. Aguirre, Exhibit 42 to Plaintiffs' Response, at 70; Deposition of F.S. Jackson, Exhibit 44 to Plaintiffs' Response, at 19-20.  Plaintiffs also argue that McClelland stated that HPD policy regarding misdemeanor arrests was being suspended for Operation ERACER, and that McClelland would not have made this statement unless Bradford had approved of the Jackson Plan.  *See* Plaintiffs' Response, at 31. Contrary to Plaintiffs' assertions, Plaintiffs' Exhibit 72 does not support this proposition.

[91]   Deposition of M.A. Aguirre, Exhibit 58 to Plaintiffs' Response, at 280.

[92]   *See* Jackson Plan, at 4 (calling for use of 55 officers and commanders).

determine whether any individuals were violating any laws.[93]   There also is a fact issue of whether, if the City's "zero tolerance" policy encompassed mass detentions, such policy was the moving force behind Plaintiffs' detentions.  Plaintiffs have thus raised genuine fact issues that defeat the City's summary judgment motion, to the extent Plaintiffs claim that "zero tolerance" was understood by policymakers to encompass "contain and scrutinize" detention.

F.    **Municipal Liability Based on Single Incident of Arrests Without Probable Cause**

Implicitly acknowledging they cannot prove a custom or pattern of arrests without probable cause, Plaintiffs seek to recover on their unlawful arrests through heavy reliance on the "single incident exception" set forth in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986).  The Supreme Court held in *Pembaur* that  liability under § 1983 could arise out of isolated decisions or actions taken by municipal policymakers.  *See id.; see also Milam v. City of San Antonio,* 113 Fed. Appx. 622, 626 (5th Cir. 2004) ("[P]laintiffs can hold municipalities liable for single instances of conduct perpetrated by the policymakers themselves; such one-time conduct can represent official 'policy' even though it does not necessarily form part of a plan or rule developed to govern all like occasions."); *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 406 (1997) (quoting *Pembaur,* 475 U.S. at 481) ("A final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations' may, in some circumstances, give rise

---

[93]    The Jackson Plan and Operation ERACER (as set forth in the Game Plan and as implemented) illustrate the "zero tolerance" policy, and suffered from the deficiency described in this section.

to municipal liability under § 1983."); *cf. Estate of Davis v. City of North Richland Hills*, 406 F.3d 375, 385-86 (5th Cir. 2003) (the "single incident as opposed to a pattern of violations" is a "narrow" exception to the 'pattern of violations' requirement that the Fifth Circuit has "been reluctant to expand"); *Bennett v. Pippin,* 74 F.3d 578 (5th Cir. 1996) (holding that municipal liability may arise under the single incident exception, provided the decision was made by a final policymaker responsible for the activity).

The Supreme Court has fleshed out the *Pembaur* "single incident" principle in subsequent cases. First, a municipality may be held liable only for "acts which the municipality has officially sanctioned or ordered." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 113 (1988) (quoting *Pembaur,* 475 U.S. at 480). A municipality can incur liability based upon the isolated actions or decisions of municipal officials only if such an official possesses "final policymaking authority." *Id.* (quoting *Pembaur,* 475 U.S. at 483). Finally, "the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business." *Id.* The Fifth Circuit has expressed reluctance to sustain a § 1983 claim based on a single incident and the opinion of an expert. *See Conner v. Travis Cty.,* 209 F.3d 794, 797 (5th Cir. 2000); *Synder v. Trepagnier*, 142 F.3d 791, 796-97 (5th Cir. 1998).[94]

---

[94]    "[W]hether a particular official has 'final policymaking authority' is a question of state law." *Praprotnik,* 485 U.S. at 123. The parties agree that former Chief Bradford was at all pertinent times the individual with relevant policy-making authority for the HPD and thus the City.

Thus, the issue here is whether Plaintiffs have presented evidence to raise a genuine issue of fact under the single incident exception that the City has potential liability for unlawful arrests during Operation ERACER based on either: (1) Bradford's own conduct, or (2) conduct by others that Bradford personally approved.  Plaintiffs argue in this connection that Bradford approved the Smith and/or Jackson Plans, which led to illegal, unconstitutional arrests when implemented on August 16, 17, and 18, 2002.

To be subject to the single incident exception, a policymaker's single decision need not itself involve the violation of a penal statute, but it must, at a minimum, involve a violation of the Constitution or federal law.  *See Pembaur*, 475 U.S. at 484 (holding city could be liable under § 1983 for county prosecutor's decision to order search that violated petitioner's Fourth Amendment rights).  Nevertheless, violations of criminal law are the typical circumstance in which liability is permitted under *Pembaur*.  *See Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996) (finding municipal liability under single incident exception where sheriff allegedly raped plaintiff); *Turner v. Upton County*, 915 F.3d 133, 137 (5th Cir. 1990) (finding municipal liability under single incident exception where sheriff and county's district attorney allegedly conspired to subject plaintiff to trial on false charges based on fabricated evidence).  Citing *Pembaur*, Plaintiffs seek to stretch *Pembaur* to reach decisions by Bradford, *i.e.*, approval of the Smith and/or Jackson Plans, that did not expressly order illegal arrests but, in the Plans' implementation by others, resulted in spontaneous illegal arrests.  Plaintiffs cite no probative authority for this aggressive proposition.  They present no evidence that Bradford as City policymaker approved the use of arrest without probable

cause as part of the Smith or Jackson Plans, as part of a "zero tolerance policy," or otherwise. Plaintiffs' claims against the City based on a single incident of arrests without probable cause are dismissed.[95]

### G.   Failure to Supervise and Failure to Protect Claims

The Court has concluded that Plaintiffs have not pleaded failure to supervise claims and that Plaintiffs at this late stage may not amend their Complaint to add claims against the City asserting insufficient supervision.[96]   The Court therefore does not address Plaintiffs' arguments regarding the merits of such claims.

### H.   Conclusion on Claims Against City

Plaintiffs may not pursue claims against the City based on their wrongful arrests because there is no evidence of a City policy or custom permitting or condoning such arrests. The Court, however, denies the City's motion for dismissal of Plaintiffs' claims against it based on their alleged wrongful detention, and that claim may proceed.[97]

## IV.   CLAIMS AGAINST BRADFORD INDIVIDUALLY

Bradford moves for summary judgment on all claims against him.   Plaintiffs do not expressly allege against Bradford any constitutional violations other than wrongful arrests.

---

[95]   Plaintiffs do not pursue claims against the City based on a formal or informal policy or practice of custodial abuse or excessive force.   There is no evidence of such a policy or practice or of Chief Bradford's approval of such measures in even one single incident.

[96]   *See supra* Part III.A.

[97]   It is unclear, and the parties have not addressed, what injuries (and damages) Plaintiffs will be allowed to claim resulted from the detention, which is actionable, as opposed to the other wrongful but non-actionable conduct.   This issue will need to be briefed and resolved before trial.

The Court has dismissed Plaintiffs' claims against the City that are based in allegations of a policy of illegal arrest (as distinct from illegal detention) and based in Chief Bradford's alleged failure to supervise.  For the reasons those claims are not legally viable against the City, Plaintiffs lack comparable causes of action against Chief Bradford.

In addition, there is an independent ground justifying dismissal of Plaintiffs' failure to supervise claims against Bradford.  In its Memorandum and Order dated October 27, 2003, this Court required Plaintiffs to amend their Complaint to flesh out their § 1983 and false arrest claims against the individual defendants.[98]  Plaintiffs amended their Complaint,[99] but failed to add any detail regarding Bradford's alleged role in Plaintiffs' civil rights injuries.  Furthermore, Plaintiffs' putative "failure to supervise" claim against Bradford deserves close scrutiny because plaintiffs suing government officials in their individual capacities face heightened pleading requirements; the plaintiff must plead specific facts that support personal liability by the individual defendant.[100]  *See Oliver v. Scott,* 276 F.3d 736, 741 (5th Cir. 2002); *Schultea v. Wood,* 47 F.3d 1427, 1430 (5th Cir. 1995); *Murphy v. Kellar,* 950 F.2d 290, 292 (5th Cir. 1992).  Plaintiffs' failure to supervise claim against Bradford therefore fails because the theory is not specifically pleaded as required by the Court's

---

[98]     Memorandum and Order dated Oct. 27, 2003, Case No. H-02-3809, at 6 n.3, 15.

[99]     They filed a Fourth Amended Complaint [Doc. # 74] in response to the Court's Order.

[100]     A suit against a city official in his official capacity is the same as a suit against a city.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  Construing the pleadings most liberally in favor of Plaintiffs, as the Court must, the Court construes Plaintiffs' Fourth Amended Complaint to assert causes of action for violations of § 1983 against Bradford in his individual capacity.

October 27, 2003 Memorandum and the cited authorities.  Thus, Plaintiffs' failure to supervise claims are dismissed as to Bradford.

The Court has concluded above that Plaintiffs may pursue Fourth Amendment claims against the City for illegal detentions resulting from the facially unconstitutional Jackson Plan and/or the City's customary use of "zero tolerance."  Bradford argues that, even if these policies or practices result in § 1983 liability for the City, he is entitled to qualified immunity.  Plaintiffs also bring state law claims against Bradford for assault and false arrest/imprisonment, to which Bradford argues that Plaintiffs cannot demonstrate the requisite personal involvement and that, in any event, he is entitled to official immunity under state law.  Each of these contentions is addressed in turn.

A.     **Section 1983 Claims Based on Policy or Practice**

Plaintiffs' remaining § 1983 claims against Bradford are based on the Jackson Plan, which called on its face for unconstitutional detentions, and the City's "zero tolerance" custom, which may have been understood to encompass illegal detentions.  Bradford argues that, even assuming he approved the Jackson Plan or the use of "zero tolerance" in Operation ERACER, he is entitled to qualified immunity because he acted reasonably.  He asserts that it is reasonable for him to have believed that HPD's experienced and "well-trained" captains would utilize "zero tolerance" in a constitutional manner.[101]  The Court concludes for reasons set forth below that Plaintiffs have produced evidence sufficient to raise a fact issue

---

[101]     *See* Affidavit of Assistant Chief M.I. Montalvo, Exhibit 7 to Defendants' Motion; Affidavit of Commander Albert Rodriguez, Exhibit 8 to Defendants' Motion.

precluding summary judgment on Bradford's qualified immunity defense on Plaintiffs' Fourth Amendment unlawful detention policy and practices claims.

Officials sued in their individual capacities are protected by qualified immunity unless the act violates a constitutional right clearly established at the time. *Sanchez v. Swyden*, 139 F.3d 464, 466-67 (5th Cir. 1998). To avoid summary judgment, a plaintiff must present evidence to raise a fact issue "material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law *and facts available to them.*" *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993), *cert. denied*, 511 U.S. 1019 (1994) (emphasis added). "The doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions." *Cozzo v. Tangipahoa Parish Council--President Gov't*, 279 F.3d 273, 284 (5th Cir. 2002) (quoting *Thompson v. Upshur Cty.,* 245 F.3d 447, 456 (5th Cir. 2001)). "The Supreme Court has characterized the doctrine as protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

In assessing qualified immunity, the Court must conduct a bifurcated analysis. *See, e.g., Collins v. Ainsworth,* 382 F.3d 529, 537 (5th Cir. 2004). First, the Court must decide whether the plaintiff alleged a violation of a clearly established constitutional right. *Id.* A right is "clearly established" if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987); *see also Collins,* 382 F.3d at 537. Second, a court must address whether

the defendant's "actions were objectively reasonable" in light of "law which was clearly

established at the time of the disputed action." *Collins,* 382 F.3d at 537. "The defendant's

acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's

circumstances would have then known that the defendant's conduct violated" the plaintiff's

asserted constitutional or federal statutory right. *Thompson,* 245 F.3d at 457 (citing

*Anderson,* 107 S.Ct. at 3040; *Malley,* 106 S.Ct. at 1096) (emphasis in original). "Thus, an

individual defendant's subjective state of mind is irrelevant to the qualified immunity

inquiry" in the context of a Fourth Amendment claim.[102]  *See Cozzo,* 279 F.3d at 284.

At the summary judgment stage of a § 1983 action, a defendant asserting qualified

immunity is not required to establish the defense beyond peradventure, as he would have to

do for other affirmative defenses.  "The moving party is not required to put forth evidence

to meet its summary judgment burden for a claim of immunity.  It is sufficient that the

movant in good faith pleads that it is entitled to absolute or qualified immunity.  Once the

[movant] *asserts* this affirmative defense, the burden *shifts* to the plaintiff to rebut it."

*Cousin v. Small*, 325 F. 3d 627, 632 (5th Cir. 2003) (citations omitted) (emphasis in

original).  Plaintiff bears the burden of negating Defendant's claim of qualified immunity.

*See Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489-90 (5th Cir. 2001); *Foster v. City of Lake*

---

[102]     In contrast, in the context of a failure to supervise claim, an individual defendant's subjective
state of mind is relevant to the defendant's deliberate indifference. *See Hernandez ex rel.
Hernandez v. Texas Dep't of Protective & Regulatory Servs.,* 380 F.3d 872, 881 (5th Cir.
2004).  A state's failure to supervise officers is a Fourteenth Amendment substantive due
process claim, not a Fourth Amendment claim regarding unlawful search or seizure, as the
*Ratliff* Plaintiffs allege in this case. *See Cozzo,* 279 F.3d at 284 n.7.

*Jackson*, 28 F.3d 425, 428 (5th Cir. 1994); *Salas v. Carpenter*, 980 F.2d 299, 305-06 (5th Cir. 1992).

To defeat the first prong of the qualified immunity test, Plaintiffs in this case assert that their right to be free from unreasonable detention was clearly established prior to the 2002 events at issue. *See, e.g., Sanchez,* 139 F.3d at 466-67. The Court agrees. The issue, however, is not whether the broad right asserted was well established, but whether it objectively would have been sufficiently clear to a person in Bradford's circumstances that the policy under scrutiny represented a violation of that right. *See, e.g., Sanchez,* 139 F.3d at 466-67 ("The Supreme Court has warned against vague or general assertions of constitutional rights and has required a § 1983 plaintiff to state with specificity the constitutional right that has been allegedly violated – otherwise, liability could be imposed in every case." (citing *Anderson,* 483 U.S. at 639)). The Court concludes that the unconstitutionality of the specific detention component of the Jackson Plan was clearly established at the time of Operation ERACER. *See Edmond*, 531 U.S. at 46-47; *Collins*, 382 F.3d at 537-38. Similarly, the mass detention aspect of HPD's "zero tolerance" custom alleged by Plaintiffs, if true, is clearly unconstitutional. Thus, Plaintiffs have produced evidence that raises fact issues to satisfy their summary judgment burden on the first prong of the qualified immunity test.

On the second prong of the test, Plaintiffs claim that Bradford's actions are objectively unreasonable because the Constitution does not permit the "contain and scrutinize" philosophy espoused by the Jackson Plan and allegedly customarily used by HPD

63

as part of "zero tolerance."  There is a genuine fact issue regarding whether Bradford knew that the implementation of the Smith Plan (as revealed by the Smith Evaluation and other circumstantial evidence) just prior to Operation ERACER involved detention of people without individualized reasonable suspicion for periods as long as two hours.  Plaintiffs have raised fact issues regarding whether Bradford knew that the Jackson Plan called for a round-up and detention of all persons who happened to be in the parking lots of open businesses the nights the Plan was implemented, and whether an objectively reasonable officer "would or should have known" that such a plan did not pass constitutional muster.  *See Collins,* 382 F.3d at 544.[103]  Plaintiffs have thus met their summary judgment burden on Bradford's plea of qualified immunity and the § 1983 claims against Bradford concerning unlawful detentions will not be dismissed.[104]

---

[103]    There are also fact issues about Bradford's knowledge and the reasonableness of his actions as to those Plaintiffs who were detained (and arrested) on August 17, 2002, because Operation ERACER took place over three different nights, August 16, 17 and 18, 2002.  The operation consumed substantial HPD resources.  If Bradford was kept promptly apprised by telephone of events on August 16 in the Operation, he likely had knowledge of the mass detentions, thereby bolstering Plaintiffs' unreasonableness contentions concerning arrests on August 17 and 18.  However, the parties point to no such evidence in the record, and indications are to the contrary.

[104]    Plaintiffs also claim that Bradford's actions were objectively unreasonable because he let the Jackson Plan as implemented go forward "for the purpose of setting Aguirre up for a fall."  Bradford's subjective motivations are irrelevant to whether his actions were *objectively* reasonable.  *Thompson,* 245 F.3d at 457 (individual defendant's subjective state of mind is irrelevant to the qualified immunity inquiry).

### B.   State Law Claims

Plaintiffs assert in the Complaint claims against Bradford based on assault and false arrest/imprisonment.  This Court dismissed Plaintiffs' assault claims in its Memorandum and Order dated October 27, 2003, so that claim will not be further considered.

Bradford argues — with good basis — that Plaintiffs have failed to establish a valid claim of false arrest/imprisonment against him, and that he is entitled to official immunity under Texas law.  "The elements of false arrest and false imprisonment are similar enough to be indistinguishable." *Villegas v. Griffin Indus.*, 975 S.W.2d 745, 754 (Tex.App.–Corpus Christi 1998, no pet.).  Under Texas law, to succeed on a false arrest and imprisonment claim a plaintiff  must show the occurrence of:  (1) a "willful detention; (2) without consent; and (3) without authority of law." *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002); *see also Sears, Roebuck & Co. v. Castillo*, 693 S.W.2d 374, 375 (Tex. 1985). "[L]iability for false imprisonment [can extend] beyond those who willfully participate in detaining a complaining party to those who request or direct the detention." *Rodriguez*, 92 S.W.3d at 507; *see also Villegas*, 975 S.W.3d at 754; *Lewis v. Continental Airlines*, 80 F. Supp. 2d 686, 695 (S.D. Tex. 1999) (Crone, J.) (liability for false arrest may extend to defendant who "directs or requests" the unlawful arrest).  "[A] plaintiff must show that the defendant clearly directed or requested the arrest . . . 'the equivalent, in words or conduct, of "Officer, arrest that man!" '" *Rodriguez,* 92 S.W.3d at 506 (quoting RESTATEMENT (SECOND) OF TORTS § 45A cmt. c).

Plaintiffs do not present evidence (or even allege in their Complaint) that Bradford personally participated in the false arrest or imprisonment of Plaintiffs on others.  Plaintiffs do not assert that Bradford was present on the night of the arrests nor that he had any contact with any Plaintiff at K-Mart or James Coney Island or subsequently at the jail.  Indeed, Defendants present uncontroverted evidence that Bradford was not in Houston on the weekend in question.  Plaintiffs only assert and present evidence that Bradford was the person who ultimately approved the Smith and Jackson Plans and associated anti-street racing initiatives.  As the Court has discussed above, Plaintiffs do not present any evidence that the Smith or Jackson Plans called for arrests or imprisonments without probable cause.  Nor is there evidence that Bradford's possible knowledge and approval of the anti-street racing initiatives rise to the level of directing or requesting *unlawful* arrest.[105]

Plaintiffs rely on three cases in their Response to Defendants' Motion, but they are inapposite.  Each involves defendants who — without any delegation of authority — ordered or directed an unlawful arrest.  *See Castillo v. Canavati*, 152 S.W.2d 785 (Tex. Civ. App.– San Antonio 1941, writ ref'd w.o.m.); *Smith v. Burdett*, 114 S.W.2d 384 (Tex. Civ. App.– Waco 1938, no writ); *Gold v. Campbell*, 117 S.W. 463 (Tex. Civ. App.– San Antonio 1909, no writ).  Plaintiffs have not presented evidence sufficient to create a fact issue that the Smith or Jackson Plans called for the *unlawful arrest* of individuals.

---

[105]   Plaintiffs similarly do not present evidence (indeed, do not argue) that the "zero tolerance" policy called for unlawful arrests.

66

Plaintiffs argue that the burden is on Bradford to come forward with evidence that Plaintiffs' arrest and imprisonment were legally justified.  *See* Plaintiffs' Response, at 51 (citing *Castillo,* 152 S.W.2d at 787).  Plaintiffs' approach is in error in light of current Texas civil law.  "When [an] alleged detention results from an unlawful arrest, to prove [the] instigation [necessary for a false arrest], a plaintiff must show that the defendant clearly directed or requested the arrest."  *Rodriguez*, 92 S.W.3d at 506.  Because Plaintiffs have not supplied any evidence to meet this burden, Bradford's motion for summary judgment on Plaintiffs' claims for unlawful arrest or imprisonment is granted.  The Court therefore need not address Chief Bradford's official immunity defense as to these claims

## V.     CONCLUSION AND ORDER

The Court concludes that Plaintiffs may proceed with their § 1983 claim against the City and Bradford based in the facially unconstitutional Jackson Plan.  To succeed on this claim, Plaintiffs must prove that Bradford personally approved of the specific Jackson Plan.  Plaintiffs may also proceed with their § 1983 claim against the City and Bradford based on a "zero tolerance" custom of detention without reasonable suspicion.  To succeed on this claim, Plaintiffs must prove the existence of such a custom and Bradford's knowledge or constructive knowledge of the custom.

The Court finds there are genuine questions of material fact that preclude summary judgment in Bradford's favor on qualified immunity on Plaintiffs' claims against Bradford based on a policy, practice, or custom of detention without reasonable suspicion.

All other § 1983 claims pleaded in Plaintiffs' Complaint against the City and Bradford are dismissed.  Plaintiffs may not amend their Complaint to assert failure to supervise claims. Plaintiffs' state law claims against Bradford are dismissed.  It is hereby

**ORDERED** that Defendants The City of Houston and C.O. Bradford's Motion for Summary Judgment [Doc. # 77] is **GRANTED in part** and **DENIED in part**.

SIGNED at Houston, Texas, this **25th** day of **July, 2005**.

Nancy F. Atlas
United States District Judge